## MILLER et al. v. TARRY et al.
### No. 9523.

Court of Civil Appeals of Texas. Austin.

Nov. 28, 1945.

Rehearing Denied Jan. 2, 1946.

502

Herbert L. Smith, of Austin, and Nelson, Montgomery & Robertson, of Wichita Falls, for appellants.

Grover Sellers, Atty. Gen., and Elton M. Hyder, Asst. Atty. Gen., for appellee Railroad Commission of Texas.

T. S. Christopher, of Fort Worth, for appellee Strickland Transp. Co., Inc.

Callaway & Reed and Rollo E. Kidwell, all of Dallas, for appellee J. P. Tarry.

McCLENDON, Chief Justice.

This suit involves the validity of an order of the Commission (Railroad Commission of Texas), dated November 2, 1940, granting to Tarry (J. P. Tarry, dba The J. P. Tarry Company) a certificate of convenience and necessity to operate a common carrier motor carrier service:

"Between Wichita Falls and Amarillo via Quanah, Childress, Memphis and Clarendon over U. S. Highway No. 370 (now 287), serving all intermediate points."

The order recited:

"All equipment to be operated under authority of this order is to be restricted to that owned by the holder of the certificate and shall not exceed Four Additional Trucks."

The suit was brought March 21, 1941, by the Millers (L. F. and F. D. Miller, dba Miller Motor Freight Lines) against Tarry (and others alleged to be interested in the certificate) and the Commission, to set

aside the order. Tarry filed a cross-action seeking to set aside an order dated November 8, 1940, granting an amendment to certificates owned by the Millers, which are noted below. An intervention by Sproles (Sproles Motor Freight Line, Inc.) as party plaintiff with the Millers was dismissed upon the ground of bar of limitation; from which dismissal there was no appeal. The suit was tried to the court without a jury June 4–7, 1945, and judgment was rendered on the latter date denying the Millers any relief upon their suit, and denying Tarry any relief upon his cross-action against the Millers. The Millers alone have appealed, urging against that portion of the judgment refusing to set aside the order granting the Tarry certificate, five points stated substantially as follows:

1. The Commission acquired no jurisdiction to grant the Tarry certificate, which was for a purely local service between Wichita Falls and Amarillo, because Tarry's application was only for an extension of his existing service from Fort Worth to Wichita Falls, so as to serve out of Fort Worth towns between Wichita Falls and Amarillo.

2 and 3. Conceding (arguendo) such jurisdiction, the order was arbitrary, unreasonable and discriminatory in that there was no substantial evidence *before the Commission* which would support a need 2) for such local service between Wichita Falls and Amarillo and intermediate points, or 3) for service between Fort Worth and Amarillo.

4. The evidence was insufficient to support the judgment.

5. The Commission on November 1, 1940 (one day prior to the Tarry order), having granted to Sproles (and Sproles having begun operation thereunder) a certificate authorizing service paralleling and covering the same towns and over identical routes as the Tarry application, the Commission and the trial court erred in not taking into consideration such service, and in not denying and cancelling the Tarry certificate "because there was evidence before the Commission that the Sproles service would relieve all inadequacies in existing service, thereby conclusively showing that public convenience and necessity did not require Tarry's service in addition to that of Sproles."

It is conceded that the application, the evidence before the Commission and that before the trial court were each sufficient to support a certificate granting extension from Wichita Falls to Amarillo of Tarry's existing certificate from Fort Worth to Wichita Falls; the contention in the above five points being that neither (1) the certificate, nor (2) the evidence before the Commission, nor (3) that before the trial court was sufficient to support the order granting a purely local service between Wichita Falls and Amarillo.

It should be noted at the outset that the Tarry application was also for extension of service from Wichita Falls to Lubbock; but that portion of the application was denied, and is not involved in the suit.

Considering point 1 (insufficiency of the application) we quote the following from the application, and its exhibits, which were filed with the Commission April 11, 1940:

Under "proposed route of · operation:"

"Fort Worth to Amarillo.

"Applicant now operates between Fort Worth and Wichita Falls via Decatur, Bowie and Henrietta under existing certificate. The proposed operation to Amarillo · is an extension from Wichita Falls to Amarillo, via Vernon, Quanah, Childress, Memphis and Clarendon, traversing Federal Highway No. 370."

"There is at the present time no direct, through motor freight service between * * * Fort Worth and Amarillo, along the prospective proposed route(s) above mentioned serving intermediate points and giving a direct, overnight, through service between said termini and intermediate points. · Freight between said towns as now handled by above named carriers must be interlined and interchanged, involving a loss of time which can be eliminated by supplying a through, direct, one-line service as will result from the granting of this application."

Proposed schedule set out in Exhibit E showed one trip daily each way between Fort Worth and Amarillo, leaving Fort Worth 8:30 p. m., Ar. Wichita Falls 12 midnight, Lv. Wichita Falls 1:30 a. m., Ar. Amarillo 8:00 a. m., Lv. Amarillo 10:00 a. m., Ar. Wichita Falls 4:30 p. m., Lv. Wichita Falls 6:00 p. m., Ar. Fort Worth 9:30 p. m. Time of departure from all intermediate points was given in this exhibit and an amendment thereto. Under the heading "Number of trucks to be operated," the application read, "Nine (9) now owned plus four (4) additional trucks

to be purchased if application granted." These trucks were listed in Exhibit B, each of which had a capacity of 1½ tons.

The application as a full compliance with the statutes and rules of the Commission is not challenged except in the particular stated in point 1, namely, that it will not support the certificate granted in the order.

■ If the order, properly construed, granted a purely local service between Wichita Falls and Amarillo, wholly independent of and disconnected from the service Tarry was giving between Fort Worth and Wichita Falls, there might be just ground for complaint that the application was insufficient to support the order. The order, however, clearly, we think, shows on its face that the certificate granted is an extension of Tarry's existing service, and only such extension. We quote from the order (emphasis ours):

"The Commission finds that from the evidence introduced at the hearing, the applicant at the present time operates a common carrier motor carrier between Fort Worth and Wichita Falls and *that this application is for an extension from Wichita Falls to Amarillo* via Quanah, Childress and other intermediate points * * *. The testimony shows and the Commission so finds that *there is no direct, through, single line motor freight service between Fort Worth and Amarillo along and over the applied for route above mentioned serving all intermediate points and giving a direct, overnight, through service between Fort Worth and intermediate points, and providing early morning delivery in each of said towns.* The testimony so shows and the Commission so finds that *freight moving by motor carrier from Fort Worth to points beyond Wichita Falls, on U. S. Highway No. 370, and intermediate between the towns of Wichita Falls and Amarillo must be interchanged between carriers at Wichita Falls, and that such interchange results in delay and inconvenience* to the shipping and receiving public. Witnesses from Quanah, Childress, Memphis, Clarendon and other points intermediate between Wichita Falls and Amarillo on U. S. Highway No. 370, who are shippers and receivers of freight, and witnesses from Fort Worth, who are shippers of freight, testified that in many instances, that shipments moving to said points from Fort Worth, by rail and by motor carrier, are not delivered to the consignees until late forenoon or afternoon of the day following shipment and some-

times are not delivered until the second day following shipment, and that this is inconvenient to them and is an inadequate service; and such witnesses testified to *the need of the proposed service of the applicant and that their convenience and necessity require a direct, one line service from Fort Worth to the points west of Wichita Falls on U. S. Highway No. 370 with overnight service and early morning delivery in each of said towns, which the Commission finds will result from the granting of this application."*

Then follows a finding of inadequacy of the rail service, following which the order reads:

"The testimony further shows and the Commission so finds that *the applicant proposes a daylight schedule, affording a morning departure from Amarillo and providing a same day service on shipments moving from Amarillo in the morning, consigned to Wichita Falls, and intermediate points, and affording delivery to the consignees in Wichita Falls and intermediate points, the same day, shipment is made, with arrival and delivery at Fort Worth the evening of the same day; that such a service is not afforded by existing facilities and that the lack thereof is an inconvenience to the public and is inadequate to meet their shipping needs.*

"The testimony further shows and the Commission so finds that the *applicant in his present operations operates between Fort Worth and Wichita Falls, serving all* intermediate points including Decatur, Alvord, Bowie and others, *but that a substantial quantity of the tonnage hauled by him is destined to points beyond Wichita Falls on U. S. Highway No. 370 and to the town of Amarillo* and that *in order for applicant to maintain and provide the service and schedules needed by the shipping and receiving public, it is necessary for the applicant to furnish a through service, without interchange, to Amarillo and the intermediate points as applied for."*

"The Commission after considering the evidence, the law and its own rules and regulations is of the opinion that the service rendered by the existing transportation facilities over the route between Wichita Falls and Amarillo covered by this application is not reasonably adequate to meet the demand and needs of the public and that *there exists a demand for and need of the additional service proposed by the applicant* and that the public convenience will be pro-

moted by granting said application and permitting the operation of vehicles on the highways designated in such application as a common carrier for hire."

"Accordingly, it is

"Ordered by the Railroad Commission of Texas that *the application* of J. P. Tarry dba The J. P. Tarry Company. for *a certificate of convenience and necessity to oper-ate a common carrier motor carrier between Wichita Falls and Amarillo be, and the same is hereby granted so* as' to authorize the operation of a common carrier motor carrier service as follows:

"Between Wichita Falls and Amarillo via Quanah, Childress, Memphis and Clarendon over U. S. Highway No. 370, serving all intermediate points.

"All equipment to be operated under authority of this order is to be restricted exclusively to that owned by the holder of the certificate and shall not exceed four additional trucks.'"

■■ Nothing, we think, could be plainer than that the order constituted in express terms a grant of the application as made; that is for an extension to Amarillo of the service which Tarry was then rendering between Fort Worth and Wichita Falls, the need for' which was stated in the application and expressly found in the order to exist. The restriction in the order of equipment to be used in the operation to that owned by the certificate owner and not to exceed four additional trucks, of necessity tied the Wichita Falls-Amarillo service to the Fort Worth-Wichita Falls service as an extension thereof. The schedules appended to the application showed an extended service to Amarillo from Fort Worth overnight, and from Amarillo to Fort Worth by daylight. Tarry was bound under the application and order to furnish such extended service. Any dereliction on his part in that regard; any attempt to use the certificate for a purely local service between Wichita Falls and Amarillo would constitute a violation of the order, to deter which ample remedy was afforded the Commission, Tarry's competitors, and' affected shippers and consignees. See Sunset v. G. C. & S. F., Tex.Civ.App., 154 S. W.2d 860 (error ref. W.M.). The Commission had continuing supervisory authority over the certificate and the operation thereunder. Any change in the operation authorized in the order, and any sale or other transfer of the certificate would require approval' of the Commission, and was subject to such conditions as the Commission might impose. Any substantial change in the service, such as from an extended one to a purely and unrelated local one, would require a new application, notice, hearing and appropriate commission findings. See Railroad Commission of Texas v. Red Arrow, Tex.Civ.App., 96 S. W.2d 735 (error ref.); Sunset case, above; Railroad Commission of Texas v. Red Arrow, Tex.Civ.App., 167 S.W.2d 249_(error ref. W.M.).

■■ It further appears to be the Millers contention under point 1 that under the application the Commission had jurisdiction to grant only a service over the indicated route 1) as to west bound freight of shipments originating east of Wichita Falls and destined to points west of Wichita Falls, including Amarillo, and 2) as to east bound freight of shipments destined to points east of Wichita Falls, including Fort Worth. There are two reasons why, we think, this contention is untenable. In the first place the application did not ask for a certificate or authorization so limited. The order, as we construe it above in the light of its several quoted recitals, was as broad as and no broader than the application. In the second place, the Commission had the power to impose such reasonable conditions, restrictions and burdens upon the service authorized as it deemed appropriate in the public interest. Therefore, even had the application requested only the restricted service for which the Millers contend, the Commission in granting the application could with propriety have required Tarry to give local service between the points shown by his schedules, in addition and as an incident to the restricted service for which alone he applied. McCracken v. U. S., D.C., 47 F.Supp. 444.

Sec. 9 of Art. 911(b), V.A.C.S., expressly provides for granting the application "upon such terms and conditions as said Commission may impose and subject to such rules and regulations as it has or may thereafter prescribe."

■■ While pleadings before the Commission are not required to comply with "strict rules applicable to written pleadings in a court of record," still an application under the motor carrier law should be sufficient to afford reasonable notice of the service applied for and the grounds therefor. See Railroad Commission of Texas v. Brown, Express, Tex.Civ.App., 106 S.

W.2d 327 (error dis. C.J.); Southland Greyhound Lines v. Commission of Texas, Tex.Civ.App., 73 S.W.2d 604. The application was sufficient to support the order as we construe it above.

Points 2 and 3 are predicated upon two contentions, one a proposition of law and the other a question of fact, namely:

1. Orders of the Commission granting certificates under Art. 911b must be supported by substantial evidence *in the hearing before the Commission,* absent which they are arbitrary and voidable upon direct attack by statutory review.

2. There was no substantial evidence before the Commission showing a need (2) for a local service between Wichita Falls and Amarillo, or (3) for a service between Fort Worth and Amarillo.

As to the first contention: Prior to the decision in the Trem Carr (Railroad Commission v. Shell, 139 Tex. 66, 161 S.W.2d 1022) and Cook (Cook Drilling Co. v. Gulf, 139 Tex. 80, 161 S.W.2d 1035) cases, this court, beginning with Rabbit Creek O. Co. v. Shell, Civ.App. 66 S.W.2d 737 (error dismissed C.J.) had uniformly held in Rule 37 cases that orders of the Commission, to be valid as against direct attack on the ground that they were arbitrary, must be supported by substantial evidence before the Commission, and upon that issue the evidence before the Commission was admissible. Empire G. & F. Co. v. Railroad Commission of Texas, Tex.Civ.App., 94 S.W.2d 1240 (error ref.); Humble v. Railroad Commission of Texas, Tex.Civ.App., 83 S.W.2d 695; Turnbow v. Barnsdall, Tex.Civ.App., 99 S.W.2d 1096 (error ref.); Gulf Oil Corporation v. York, Tex.Civ. App., 134 S.W.2d 502 (error dis. C.J.); Railroad Commission v. Shell, Tex.Civ. App., 154 S.W.2d 507; Cook Drilling Co. v. Gulf, Tex.Civ.App., 155 S.W.2d 638. In the York case there was a detailed review of the Texas cases on the subject, including the following quotation from Brown v. Humble, 126 Tex. 296, 83 S.W. 2d 935, 99 A.L.R. 1107, Justice Sharp writing:

"The decisions of the Railroad Commission on this question must be based upon proof, and must not be capricious or unreasonable. The mere holding of a hearing does not justify its action. If after a hearing the commission acts without regard to the evidence, or makes a ruling wholly unsupported by the evidence, it cannot be said to have exercised its discretion.

And where it is shown that the commission has abused its discretion, or has acted illegally and issued a permit in violation of its rules, the courts are fully authorized to nullify the permit of the commission and prevent its enforcement. Shupee v. Railroad Commission, 123 Tex. 521, 73 S.W.2d 505; 42 Corpus Juris, pp. 691, 692." [134 S.W.2d 505.]

The York opinion pointed out that "this doctrine has been many times announced by the Federal Supreme Court" and quoted from Interstate Commerce Commission v. Louisville & Nashville, 227 U.S. 88, 33 S. Ct. 185, 57 L.Ed. 431.

The above holding of this court was overruled in the Trem Carr and Cook cases, from the former of which we quote [139 Tex. 66, 161 S.W.2d 1030]:

"In Texas, in all trials contesting the validity of an order, rule, or regulation of an administrative agency, the trial is not for the purpose of determining whether the agency actually heard sufficient evidence to support its orders, but whether at the time such order was entered by the agency there then existed sufficient facts to justify the same. Whether the agency heard sufficient evidence is not material. In fact, the evidence heard by the agency is not per se admissible upon the trial in the district court. Whether it is admissible upon the trial in the district court must depend upon its own merits under the general rules of evidence, and without regard to whether it had theretofore been introduced before the agency. Magnolia Petroleum Co. v. New Process Production Co., 129 Tex. 617, 104 S. W.2d 1106; Railroad Commission of Texas v. Magnolia Petroleum Co., 130 Tex. 484, 109 S.W.2d 967; Lone Star Gas Co. v. State of Texas [137 Tex. 279], 153 S.W.2d 681."

While conceding the authoritative effect of the holding expressed in the above quotation from the Trem Carr case as applied to review of administrative orders on the ground that they violate one's constitutional rights in that they amount to a confiscation of one's property and deny the equal protection of the law (as contended for in Rule 37, proration and rate cases), the Millers contend that the rule is not applicable to orders of the Commission which do not involve property rights, such as that in issue.

This distinction, we think, is clearly untenable. The function of the Commission is the same in each instance;

whether it be to determine (1) the propriety of a permit to operate for hire over the public highways; or (2) the proper spacing of wells or proper allowable in production under the oil and gas conservation laws; or (3) the appropriate rate to be charged by a public utility for its service (gas, electric current, transportation by rail, pipe line, and so on). The agencies of the State are all charged with the function primarily of regulation in their several fields of operation. The function of the courts is simply one of review of their orders. The fact that in certain characters of orders, involving the constitutional issue of due process, the courts hold that an independent factual review of the sustaining evidence and not merely a determination of whether substantial evidence existed in support of the administrative order is required, does not alter the relative functions of the administrative board and reviewing court. As was held in Marrs v. Railroad Commission, 142 Tex. 293, 177 S.W.2d 941, 950:

"A court has the right to review the action of the Railroad Commission, and to strike its orders down if they are illegal; but it has no authority to write a proration order for the Commission, nor to prescribe the terms of a subsequent order to be entered by the Commission." Citing Brown v. Humble, above, and a number of other cases.

And it should be noted that the above holding was in a case involving due process in which it was held that independent judicial factual review was essential to due process.

■■■■■■ It has always been held in this State, so far as we have been able to discover, that in appeals to the courts from administrative orders under statutory authority the trials are de novo, and (except in workmen's compensation cases) the issue before the courts is the validity of the orders of the administrative boards. The only procedural difference in the two classes of cases above noted is in the character of factual review held to apply—whether in one class of cases the evidence introduced at the trial showed that at the date of the order substantial evidence in its support existed, or whether in the other class of cases the evidence introduced at the trial, and weighed independently of the administrative board's finding, supported the order. In either case the judgment authorized is the same, either to strike down the order (in whole or in part) on the ground of some invalidity, or to refuse to strike it down. In no event are the courts authorized to substitute their judgment for that of the administrative board; and in all such cases the board is charged with the duty of exercising its judgment in determining what kind of an order it will make. If it would be arbitrary, unreasonable or capricious for a board to make an order in one class of cases, without substantial supporting evidence before it, it would be equally so in the other class. The above quoted excerpt from the Trem Carr case is all inclusive, and manifestly was intended to lay down a general rule applicable to all appeals from administrative orders.

An entirely different question than that here involved is presented in cases where the administrative board has no hearing or refuses to hear any evidence upon some issue as to which it is required by law to make a finding. See Red Arrow cases, above.

That the trial in appeals from Commission orders in motor vehicular transportation cases is of the same general character as those in other classes of appeals from administrative orders was expressly held in Railroad Commission of Texas, v. Rau, Tex.Civ.App., 45 S.W.2d 413 (error dis. C.J.), the following excerpt from which was quoted with manifest approval in Lone Star v. State, 137 Tex. 279, 153 S.W.2d 681, 697 (a gas rate case):

"Appellants contend that the transcript of the record in the railroad commission hearing was improperly excluded on the ground that the proceeding provided for in section 17 of the act [Vernon's Ann.Civ. St. art. 911a] is merely a review of the correctness of the order of the commission based upon the record before it. This contention is supported by a number of citations from other states, the statutes of which are different from our own, which provides that the proceeding 'shall be tried and determined as other civil causes in said court.' Similar provisions appear in R.S. arts. 6059 and 6453, giving the right of appeal to the courts from orders of the railroad commission in other matters; and the holding has been, wherever the question has arisen, that the proceeding in the district court is a trial de novo, and not merely a review of the railroad commission's action upon the record made before the commission. Each party is permitted to introduce such evidence as is pertinent to

the controversy, regardless of whether it had been introduced before the commission, as in all other de novo trials.

• "The opinion of the commission is important only as showing the grounds upon which it based its action.

"The transcript of the evidence before the commission is not admissible as such. It might become admissible as secondary evidence where a proper predicate is laid; and it may be employed for impeachment purposes, which appears to have been freely done in this case."

■ The suggestion is made in the Millers brief that the expression "impeachment purposes" in the above quotation relates to impeachment of the Commission's order on the ground that the Commission acted without sustaining substantial evidence before it. No such meaning may properly be ascribed to the quotation. The impeachment there referred to was of a witness whose testimony in the court trial differed from his testimony before the Commission.

■ Upon the second contention under points 2 and 3 the record shows that the motor common carrier service over U. S. Highway 370 between Fort Worth and Amarillo between April 1940, the date of the Tarry application, and November 1940, when the Tarry and other applications over this route were granted, was as follows:

1. The Tarry service was, as stated, between Fort Worth and Wichita Falls, and all intermediate points.

2. The Millers operated local service between Wichita Falls and Amarillo, serving all intermediate points, and three through services between Dallas or Fort Worth as one terminus and Amarillo as the other, but serving no intermediate points, as follows: Fort Worth to Amarillo over Highway 370; Fort Worth to Amarillo via Jacksboro to Wichita Falls and thence to Amarillo over Highway 370; Dallas to Amarillo over Northwest Highway to Rhone and thence to Amarillo over Highway 370.

3. Sproles operated two services between Fort Worth and Vernon, one entirely over Highway 370, the other via Jacksboro to Wichita Falls thence over Highway 370; also a service Dallas over N. W. Highway to Rhone, thence to Vernon over Highway 370. All three of these operations served all intermediate points.

4. Andis Bros. operated between Childress and Amarillo over Highway 370 serving all intermediate points.

About the time of the Tarry application the Millers applied for amendments to their several certificates so as to authorize unrestricted service between Fort Worth and Amarillo serving all intermediate points.

About August 1940 Sproles acquired the Andis certificate and applied for Commission approval of the transfer and for extension of his service so as to bridge the gap between Vernon and Childress, thereby giving service between Fort Worth, Dallas and Amarillo and all intermediate points.

There were extensive hearings on all of these applications, those of Miller and Tarry being held jointly, as follows: At Paducah May 14 and 15, at Dallas May 20 to 22, at Fort Worth June 6 and 7, and at Lubbock August 1 to 8. 158 witnesses were heard in these hearings, the transcript of the testimony covering 1940 typewritten pages. Hearing on the Sproles application was at Dallas and consumed four days beginning September 18. There were numerous witnesses, the transcript of the testimony covering 1258 pages. The order granting the Sproles application was dated November 1, that granting Tarry's November 2, and that granting the Millers (with restriction, however, to the two termini as between Fort Worth and Wichita Falls) November 8, the order reciting that it was considered on November 2. All dates are 1940. The transcript of testimony in the Tarry and Miller joint hearings was introduced by the Millers for the sole purpose of showing that there was no testimony before the Commission supporting the Tarry order. The transcript in the Sproles hearing was not offered. Sproles testified, however, as a witness for the Millers, as to the need for the service for which he applied, and that testimony in support thereof was given before the Commission. His testimony showed that the Andis service was (between Amarillo and Childress) very poor and inadequate, the equipment of the owners in bad order, and the owners unable financially to improve it. Upon advice of his attorney, who, he supposed had obtained some sort of temporary authority from the Commission, he went into possession and operated the Andis line before his application to purchase was approved November 1. His testimony also showed that as soon as his

application was granted and on the same day, he began to operate over the entire route, Fort Worth-Amarillo and intermediate points. His testimony, which was clearly sufficient to show the need for the service he sought and supported the order granting it, is stated more in detail under point 4 below.

While the Sproles hearing was not a joint one with the other two applicants, the three were so interrelated that the evidence and action of the Commission regarding any one of them had direct bearing on each of the others. Each of the applicants was a competitor of the other two, and all the applications were before the Commission at the same time and acted upon practically simultaneously. The slight difference in dates of the three orders is inconsequential. Under these circumstances the Millers not only failed to meet the burden resting upon them to show invalidity of the order in the respect involved, but their own testimony affirmatively showed both at the trial and before the Commission at least a need for the service sought by Sproles, which was the very same service granted to Tarry. As said in Railroad Commission of Texas v. Brown Express, Tex.Civ.App., 106 S.W.2d 327, 329 (error dis. C. J.), "in addition to the evidence adduced at the hearing, the Commission as an administrative body is authorized, in passing on such applications, to take into consideration existing services over such route as disclosed by their own records of outstanding certificates." Clearly the Commission is authorized to consider the evidence upon other hearings held during the same period and covering the same route and the same character of service, to each of which all three applicants were parties at interest.

It is not necessary to cite authority upon the now elementary proposition that orders of the Commission made in the exercise of its delegated authority, are prima facie valid, and the burden is on one attacking them to show their invalidity by affirmative proof. That burden the Millers did not meet.

With reference to point 4, that the evidence at the trial below was insufficient to support the judgment, the record shows, in addition to what has been already said, the following:

The only testimony bearing upon the existing service, at the time the three applications were passed on in November 1940, was that of King, general manager of the Millers, and Ed Sproles, operator of the Sproles lines. Both witnesses were offered by the Millers. We approve the following, from Tarry's brief, as a fair resume of the pertinent portions of this evidence:

That of King: "Could not give any figures concerning the amount of traffic handled by Miller & Miller between any of the stations they served in 1940, and was unable to furnish information as to the number of vehicles operated by them in 1940. Any freight which moved between Ft. Worth and any point on the Miller & Miller line north of Ft. Worth had to be interchanged at Wichita Falls, and such interchange involved considerable delay. There were lots of complaints from shippers with respect to service between Ft. Worth and points between Wichita Falls and Amarillo. Miller and Miller filed an application with the Railroad Commission to serve between Ft. Worth and Wichita Falls and points north of Wichita Falls. At that time Tarry operated between Ft. Worth and Wichita Falls. They received such authority on November 8, 1944, and thereafter competed with Tarry between Ft. Worth and Wichita Falls, which were the largest communities on the route of J. P. Tarry."

That of Sproles: "In October 1940, purchased a certificate from Andis Bros. from Amarillo to Childress. Filed an application with the Railroad Commission to take in the skip of fifty miles between Vernon and Childress. 'We received an order from the Railroad Commission granting us the authority to operate between Vernon and Childress, which did connect the Andis operation and Sproles. At that time the Andis operation went out of existence and it was Sproles' operation then from Vernon in to Amarillo.' 'Senator Rawlings was in Austin the date the operation was granted, and the certificate issued. He called me over the phone and he says, "you have authority issued by the Commission. The order is signed today and you can start hauling freight whenever you want to." I asked him if he could have freight that night, and he said "yes", and I started. The date the order is signed (Nov. 1, 1940) is the date I started operating between Vernon and Amarillo by Sproles. The Andis Brothers, of course, transferred the certificate and operating

rights to Sproles Motor Freight Lines at the same time that they granted the new application between Vernon and Childress.'

"The Andis Bros. Freight Line was in delapidated condition and we were able to give a little better service.

"Prior to approval by the Railroad Commission after hearing, some thirty or forty days before November 1, 1940, because of the emergency situation with respect to the bad condition of Andis Bros.' equipment and the unwillingness of Andis Bros. to continue to operate until the Commission could have a hearing Sproles took over the Andis Bros. operation, on advice of his counsel, he understanding that his counsel had secured some sort of temporary permission from the Railroad Commission.

"In 1940, there was a need for Sproles to close the gap in its operation between Vernon and Childress in order to handle Dallas and Ft. Worth freight to points north of Vernon. In 1940, the following statement was true: (quotation from Sproles application)

" 'There is a substantial volume of tonnage available to be transported between towns on the route covered by this application and the extension thereof to Amarillo; that the existing service to such points from the points named being served by applicant is inadequate, and public convenience and necessity require the granting of this application. For all the reasons alleged and the public convenience and necessity, and in the interest of the shipping public will be served by the granting of this application.' That was an application for 'a certificate of convenience and necessity to operate as a common carrier from Vernon to Childress, Texas, via Quanah and other intermediate points using U. S. Highway 287, and for authority to transport commodities generally for the public, to from and between the cities and towns along said route, and in addition to coordinate the service along the route covered by this application with the service being now rendered or which may hereafter be rendered by the applicant to, from and between the cities and towns it is authorized now to serve or may be authorized to serve in the future. In 1940, I thought there was a need for the service proposed.'

"The Railroad Commission held a hearing, and 'we furnished lots of witnesses on these different towns. The witnesses came down and testified the need of a service, and that is why the Commission granted the service, I imagine. If there was a need then, there was a need on November 1st.' They testified as to the need of a service over this route between Vernon and Childress in order to provide service to, from and between those towns. We probably had some from Wichita Falls. I don't remember about Hedley. We brought some from Memphis, Clarendon, Childress, Estelline. I also testified in support of the application."

Not only did the Millers not meet the burden resting upon them to show that there was no basis in the evidence for the Tarry order, but their own testimony affirmatively established such basis.

■■ As to point 5: There is no substantial basis for the assertion therein that since the Sproles application was granted and the service thereunder put in operation before the Tarry application was granted, "the Commission erred in not taking such service into consideration and in not refusing the Tarry application, and the court erred in not setting aside such order, because there was evidence before the Commission that Sproles's service would relieve all inadequacies in the existing service, thereby conclusively showing that public convenience and necessity did not require Tarry's service in addition to that of Sproles."

The Tarry application was made and a number of hearings held thereon before Sproles contracted for the Andis certificate or applied for confirmation thereof and for extended service beyond Vernon to Amarillo. The evidence showed without question the need for the extended service for which Tarry applied. The record not only does not show that the Commission did not take into consideration the order granting the Sproles service, but it is manifest that the Commission considered all three applications together, had before it the record of hearings in all of them, and granted them all practically simultaneously. The Commission had a wide discretion in passing upon these applications and was fully authorized, under the showing of need to grant either or all of them, and upon such terms as it deemed appropriate. The fact that one of the applicants may have regarded its proffered service as all sufficient would not justify striking down the

512

competition service granted at the same time to either of the other two.

■ The sixth point complains of the court's action in overruling the Millers plea in abatement to Tarry's cross-action seeking to set aside the order amending the Millers certificate; the plea being predicated upon the failure of Tarry to file with the Commission a motion for rehearing of the order. It has been repeatedly held that such motion is not essential to the right of appeal from such orders. Houston Chamber of Commerce v. Commission, Tex. Civ.App., 19 S.W.2d 583, aff. 124 Tex. 375, 78 S.W.2d 591; Smith v. Wald, Tex. Civ.App., 97 S.W.2d 991 (error dis. C. J.); Trapp v. Atlantic, Tex.Civ.App., 170 S.W. 2d 506 (error ref.); Thomas v. Stanolind, Tex.Civ.App., 188 S.W.2d 418. The question, however, is purely academic in the present appeal, since the trial court rendered judgment denying all relief sought under the cross-action, and there is no appeal from such judgment or cross-assignment challenging it.

■ Tarry has filed two cross-points asserting error of the trial court in overruling his motion to dismiss Millers' suit on the ground of unreasonable delay (1) in filing the suit after the motion for rehearing was overruled by the Commission (December 17, 1940, to March 21, 1941); and (2) in the pendency of the suit without trial (March 21, 1940, to June 4, 1945). These cross-points are presented only in the alternative in case the trial court's judgment be not affirmed; and their consideration is therefore unnecessary.

The trial court's judgment is affirmed.

Affirmed.