**ALAMO EXPRESS, Inc. et al., Appellants,**

v.

**UNION CITY TRANSFER et al., Appellees.**

**No. 10431.**

Court of Civil Appeals of Texas.

Austin.

. Dec. 12, 1956.

Rehearing Denied Feb. 20, 1957.

Smith & Steakley, Phillip Robinson, Austin, for appellants.

John Ben Shepperd, Atty. Gen., Mert Starnes, Asst. Atty. Gen., John H. Benckenstein, Beaumont, Ewell H. Muse, Jr., Morgan Nesbitt, Austin, Jo E. Shaw, Houston, Looney, Clark & Moorhead,

Thomas E. James, Charles D. Mathews, Austin, for appellees.

GRAY, Justice.

This appeal is from a judgment sustaining an order of the Railroad Commission of Texas granting specialized motor carrier certificates to appellees.

Appellants are twenty five regular route common carrier motor carriers.

The Railroad Commission of Texas will be later referred to as the Commission and the specialized motor carriers as appellees.

Prior to all times material here appellees were the owners and operators of specialized motor carrier certificates authorizing them to transport

"Oilfield Equipment and Pipe, when moving as oilfield equipment. Pipe when it is to be used in the construction and maintenance of pipe lines of any and every other character or use other than oilfield equipment; except the carrier is prohibited from transporting pipe when not moving as oilfield equipment when such pipe is less than four (4″) inches in diameter and is also less than twenty-eight (28) feet in length.

"Trenching Machines * * *" (then follows a list of various machines, materials and equipment) "when said commodities are not moving as oilfield equipment, as follows:

" 'The holder of this authority may transport the above named commodities together with its attachments and its detached parts thereof between incorporated cities, towns and villages only when the commodity to be transported weighs 4,000 pounds or more in a single piece or when such commodity, because of physical characteristics other than weight, requires the use of

"special devices, facilities or equipment" for the safe and proper loading or unloading thereof.

" 'The term "special devices, facilities or equipment" is construed to mean only those operated by motive or mechanical power.' "

Prior to the times material here appellees had transported machinery, materials and equipment for various industries under the belief that they were transporting oilfield equipment and that their operations were lawful. Their authority was questioned and thereafter appellees filed separate applications with the Commission to amend their existing certificates.

It appears that some 150 applications were filed by 128 specialized motor carriers. Separate notices were issued on the applications and upon the call of the docket of the Commission the applications were each set down for hearing at the Lamar Hotel in Houston for March 15, 1954. On that date appellants together with other parties appeared before the examiner as protestants. The examiner after a lengthy discussion with and between the attorneys for the various parties consolidated the hearings and heard the applications on a consolidated record. Appellants objected to the consolidated hearing. Thereafter on May 13, 1954, the Commission granted appellees specialized motor carrier certificates authorizing them to transport

" * * * pipe when it is to be used in the construction of pipe lines of any and every other character or use other than oilfield equipment between the points within the area covered by the existing certificates of the applicants; except that the applicants are prohibited from transporting pipe when not moving as oilfield equipment, where both origin and destination are places on the certificated routes of regular route common carrier motor carriers,

when such pipe is less than four inches (4″) in diameter and is also less than twenty-eight feet (28′) in length.

"It is further ordered by the Commission that the certificates enumerated in the caption of this order be amended so as to authorize the transportation by these applicants, when said commodities are not moving as oilfield equipment and when said commodities require specialized equipment for the loading or unloading, and transportation, thereof, between all points within in the area covered by the existing certificates, as follows: Absorbers (scrubbers) * * *"

Then follows a list of machines, materials and equipment not listed in the original certificates and the order concludes with the restriction that:

" 'The Holder of This Authority may transport the above-named commodities (beginning with the commodity "Absorbers") together with its attachments and its detached parts thereof, between points in the pickup and delivery limits of the regular route common carrier motor carriers in incorporated cities, towns and villages only when the commodity to be transported weighs 4,000 pounds or more in a single piece or when such commodity, because of physical characteristics other than weight, require the use of "special devices, facilities or equipment" for the safe and proper loading or unloading and transportation thereof.

" 'The term "special devices, facilities or equipment," is construed to mean only those operated by motive or mechanical power.' "

Appellants filed objections and exceptions to the above order and requested oral argument before the Commission. This request was granted, oral arguments were heard and on August 18, 1954, the Commission overruled the exceptions and objections.

Appellants timely filed this suit and at a nonjury trial the Commission's order was sustained.

Findings of fact and conclusions of law were filed by the trial court.

Appellants' points are to the effect that the trial court erred in sustaining the Commission's order because: (1) as a matter of law the Commission could not have reasonably discharged the mandatory duties required by the specialized motor carrier act in connection with each of the applications; (2) there was no substantial evidence before the trial court supporting the Commission's order; (3) the order of the Commission is void because it fails to set forth full, complete and detailed fact findings of the inadequacy of existing services or the public need for the proposed new services; (4) the Commission was without jurisdiction to authorize the transportation of many of the named commodities by specialized motor carriers because they never move with physical characteristics requiring special equipment for loading, unloading and transportation and others only occasionally move with such qualifying characteristics; (5) the order is invalid and is a denial of due process because it is uncertain, indefinite and ambiguous because it fails to provide reasonable standards, definitions and limitations of what is or is not a violation of the order sufficient to prevent discrimination in its enforcement; and (6) the trial court erred in refusing appellants' alternative request that if the order is sustained then that a declaratory judgment be rendered declaring the meaning of the order and its provisions which are indefinite and not measurable by standards contained in the order. Point 1–A is to the effect that there is no evidence or insufficient evidence to support numbered findings of fact, and Point 1–B is to the effect that the trial court erred in failing to make requested findings of fact.

In their brief appellants say:

"As previously stated the controlling issues in this case summarized

in Points I through V are issues concerning (1) whether the Commission's action in this case can be reconciled with jurisdictional and procedural limitations imposed by the 1941 Specialized Motor Carrier Act and (2) whether the Commission's action in this case was reasonably supported by substantial evidence before the Trial Court. Appellants are convinced that these controlling issues of statutory interpretation and substantial evidence are legal issues which cannot and do not turn upon determination of individual fact issues but rather must be resolved, as *question* of law always are, by application of the judicial processes of the Court to the whole record before the Court whereby such legal issues are raised."

They also say that Points 1–A and 1–B relate to subsidiary errors of the trial court.

As bearing on appellants' points it is proper to here notice certain of the provisions of Art. 911b, Vernon's Ann.Civ. St., and also undisputed facts contained in the record before us.

Sec. 1(i) defines specialized motor carriers and as applicable here they are defined as those transporting over the highways of the State "over irregular routes on irregular schedules, for compensation and for the general public with specialized equipment, property requiring specialized equipment in the transportation and handling thereof;" providing that the term shall not apply to motor vehicles operated exclusively within the incorporated limits of cities and towns, and,

"* * * provided further the term 'specialized motor carrier' as used herein shall include those carriers who engage or desire to engage exclusively in the transportation of livestock, livestock feedstuff, grain, farm machinery, timber in its natural state, milk, wool, mohair, or property requiring specialized equipment as that term is herein-

after defined, or any one, or more, of the foregoing named commodities.

"For the purpose of this Act, the term 'specialized equipment' includes, but is not limited to block and tackle, hoists, cranes, windlasses, gin poles, winches, special motor vehicles, and such other devices as are necessary for the safe and proper loading or unloading of property requiring specialized equipment for the transportation and handling thereof.

"For the purpose of this Act, the term 'property requiring specialized equipment' is limited to (1) oil field equipment, (2) household goods and used office furniture and equipment, (3) pipe used in the construction and maintenance of water lines and pipe lines, and (4) commodities which by reason of length, width, weight, height, size, or other physical characteristic require the use of special devices, facilities, or equipment for their loading, unloading, and transportation.

"For the purpose of this Act, the term 'oil field equipment' means and includes machinery, materials, and equipment incidental to or used in the construction, operation, and maintenance of facilities which are used for the discovery, production, and processing of natural gas and petroleum, and such machinery, materials, and equipment when used in the construction and maintenance of pipe lines."

It is not disputed that the applications in question here meet the requirements of Sec. 5a(c) and were sufficient to confer jurisdiction on the Commission to set for hearing, hear and determine the same. Appellants say the applications should not have been heard jointly.

Sec. 5a(d) provides, in part:

"Before any such application shall be granted, the Commission shall hear, consider and determine said application

in accordance with Sections 8, 9, 11, 12, 13, 13a, 14 and 15 * * * The Commission shall have no authority to grant any application for a certificate of convenience and necessity authorizing operation as a 'Specialized Motor Carrier' or any other common carrier unless it is established by substantial evidence (1) that the services and facilities of the existing carriers serving the territory or any part thereof are inadequate; (2) that there exists a public necessity for such service, and (3) the public convenience will be promoted by granting said application. The order of the Commission granting said application and the certificate issued thereunder shall be void unless the Commission shall set forth in its order full and complete findings of fact pointing out in detail the inadequacies of the services and facilities of the existing carriers, and the public need for the proposed service."

Sec. 8 vests the Commission with authority and makes it its duty to determine, under its promulgated rules, after considering existing transportation facilities and the demand for, or need of additional service, if there exists a public necessity for the service applied for and if public convenience will be promoted by granting the application.

Sec. 9 makes it the duty of the Commission to determine if the designated highways are suitable for or are subject to such use as to permit the use applied for without unreasonable interference with the use of such highways by the general public and specifies that "the Commission shall give weight and due regard to:

"(1) Probable permanence and the quality of service offered by the applicant.

"(2) The financial ability and responsibility of the applicant and its organization and personnel.

"(3) The character of vehicles and the character and location of depots or termini proposed to be used.

"(4) The experience of the applicant in the transportation of property and the character of the bond or insurance proposed to be given to insure the protection of the public."

Sec. 11 provides for the giving of notices of the time and place for the hearing of applications and provides the hearing may be had at some place other than in the City of Austin.

Sec. 12 provides the hearing shall be conducted under such rules and regulations as the Commission may prescribe, gives interested parties the right to appear and present evidence and argument and makes it the duty of the Highway Commission, upon the request of the Commission, to furnish information relating to the highways designated in the application and other information deemed pertinent by the Commission.

Sec. 13 provides that before a certificate may be issued the carrier shall file with the Commission bonds or insurance policies in the amount fixed by the Commission, provides the conditions of such bonds and insurance policies and further that the carrier shall protect its employees with Workmen's Compensation Insurance.

Sec. 13a vests the Commission with the authority to approve or disapprove the equipment to be used under any certificate, the amount and character of tonnage which may be hauled on any vehicle under the certificate, the size and number of the packages of any commodity to be transported on the vehicle and the method of loading, the dimensions of the equipment and the tonnage of the load not to be greater than otherwise permitted by law.

Sec. 14 gives the Commission authority to hear and determine all applications of motor carriers, to hear complaints, institute

investigations, compel the attendance of witnesses, take testimony under oath, make a record thereof, to render judgment upon the record, and to do all things necessary to carry out the provisions of the Act. It also authorizes an examiner to hear applications assigned to him by the Commission.

Sec. 15 provides for the payment of witnesses, the service of subpoenaes for witnesses and other process issued by the Commission and the payment of fees for such service.

Appellants are regular route common carrier motor carriers engaged in the business of transporting general commodities between points on regular routes and on regular schedules as authorized and fixed by their certificates. They may interchange shipments among themselves and with other carriers and in this way afford a statewide service over designated routes and on designated schedules to fixed points. They do not and are not authorized to pick up or deliver shipments at points not on their designated routes and of course cannot render a pick-up or delivery service to job or drilling sites not on their designated routes. These sites are usually located off of the highways and rail lines and service to and from them, at least to and from such sites not on the highways and rail lines, must be by carriers other than appellants or rail lines.

Prior to the complained of order appellees seemingly did and thereafter were authorized to render, all together, a statewide service over irregular routes and on irregular schedules without limitation (except by the restrictions contained in their certificates) as to pick-up or delivery points whether such points or either of them were on or off of the highways and rail lines.

Prior to the complained of order authority to transport the commodities therein named over irregular routes on irregular schedules did not exist except when the same were moving as oil field equipment under appellees' prior certificates. Therefore it is established that existing services were inadequate. Public necessity and public convenience will be later noticed.

There is evidence that appellants do not own or maintain, except at some of their main or principal terminals, equipment sufficient to load and unload many of the commodities named in the order and that they employ outside equipment for said purposes which necessarily results in delay in pick-up and delivery of shipments. These facts are relevant to the issues of public convenience and necessity as well as to the inadequacies of existing service.

It is not disputed that the same machinery, materials and equipment used for the discovery, production and processing of natural gas and petroleum and the construction and maintenance of pipe lines are also used in the sulphur, water well, irrigation and chemical industries.

The examiner had before him the financial statements and the equipment reports of appellees then on file with the Commission under their original certificates. We do not understand that appellants question the probable permanence and the quality of service offered by appellees, their financial ability, their organizations and personnel, the character of the vehicles proposed to be used, their experience in the transportation of property nor the character of the insurance they propose to give for the protection of the public and their employees.

■ In determining the applications of appellees it was proper for the Commission to consider the equipment and existing services of appellees as shown by its own records. Miller v. Tarry, Tex.Civ. App., 191 S.W.2d 501. Er. ref., n.r.e.

Appellants' point one complains of the consolidated hearing before the examiner (not the consolidated hearing on appeal). As already noted the applications were sep-

arately filed and some were filed at different times. On call of the Commission's docket they were all set down for hearing at the same time and place and notices of such hearings were duly issued. The Commission's Rules 26 and 27 respectively provide:

"All pending applications filed with the Commission by 5:00 o'clock P.M. on Thursday next preceding the first Tuesday of a calendar month shall be called at the call of the docket at 9:00 o'clock A.M. on the first Tuesday of said calendar month and assigned for hearing at such time and place as may be designated by the Director of the Motor Transportation Division."

"Written notice of the scope and time and place of hearing on each application set as provided in Rule 26 shall be issued by the Commission as required by law."

■ Appellants assert that Rule 26 was not complied with. There is evidence that each application filed is processed and handled separately. Rule 26 is procedural. We have not been cited to any authority, and we know of none, holding its provisions to be mandatory. Moreover the Rule does not prohibit applications filed after the first Tuesday in a calendar month to be called and assigned for hearing prior to the succeeding first Tuesday. If they were so called and assigned for hearing they would not be pending for settings at five o'clock P.M. on Thursday preceding the first Tuesday of a calendar month.

The Commission's Rule 39 provides:

"No hearing of two or more applications * * * shall be heard on a joint record without the affirmative consent of all parties, both applicant and protestant, unless the presiding examiner shall find prior to the consolidation of such proceedings that substantial justice cannot be afforded without the consolidation."

■

Appellees' applications applied for grants of the same authority to transport property however in a radius of different points and altogether for a statewide service. For these reasons evidence relevant to one application, with exceptions as to territory to be served would be relevant generally to all applications jointly heard.

As above noted after discussions by and with the attorneys for the parties the examiner announced the applications would be heard on a consolidated docket and said:

"As to hearing on a consolidated docket, I think that would be the only practical way we can hear it. It would be a worse burden on you to try them at one time, * * *" (The applications were heard on a consolidated docket and the above statement may not clearly state the intent of the examiner.)

In Thompson v. Hovey Petroleum Co., 232 S.W.2d 146, this Court said the fact of consolidation itself is an implied finding by the examiner that substantial justice could not be afforded without consolidation. The Supreme Court reversed our judgment in that cause but on other grounds. In its statement of the case the Supreme Court said "all applications being heard together over the objection of protestants." It did not further discuss the consolidation. Thompson v. Hovey Petroleum Co., 149 Tex. 554, 236 S.W.2d 491, 492.

■ Appellants were not restricted as to the number of witnesses called, the time consumed in offering evidence or in any way limited in the presentation of their objections to the granting of the applications and defending their interests. Appellants have not shown they were harmed by the consolidated hearing and due process was not violated as to them. G & H Motor Freight Lines v. Railroad Commission, Tex.Civ.App., 140 S.W.2d 946, Er. dism. c.j. Moreover appellants were afforded due process on the trial de novo

wherein they had an independent judicial review of the Commission's orders. Lone Star Gas Co. v. State, 137 Tex. 279, 153 S.W.2d 681, 699. Miller v. Tarry, supra.

■ The fact that numerous applications were heard by the Commission at the same time does not show as a matter of law that the Commission "could not have reasonably discharged the mandatory administrative duties required by the 1941 Specialized Motor Carrier Act in connection with each of the 150 applications." As noted supra the applications applied for similar authority and the evidence as to the needs for one was relevant as to needs for the others. In Miller v. Tarry, supra [191 S.W. 2d 511] the Court said:

"The record not only does not show that the Commission did not take into consideration the order granting the Sproles service, but it is manifest that the Commission considered all three applications together, had before it the record of hearings in all of them, and granted them all practically simultaneously. The Commission had a wide discretion in passing upon these applications and was fully authorized, under the showing of need to grant either or all of them, and upon such terms as it deemed appropriate. The fact that one of the applicants may have regarded its proffered service as all sufficient would not justify striking down the competition service granted at the same time to either of the other two."

Appellants' point one is overruled.

Witnesses representing the sulphur industry testified that exploration for sulphur was not limited to any particular area of the State; that drilling rigs and other items of equipment listed in the applications are used in exploring for sulphur and in its production; that sites for exploration are usually not on rail lines, highways or country roads but may be on a mountain in West Texas or in a swampy area near the Gulf Coast. These witnesses testified to the need for the proposed services.

Drilling contractors testified that in addition to oil and gas wells they drilled salt water injection wells, water wells for municipalities, for irrigation, on farms and ranches and for the chemical and sulphur industries. One witness testified to drilling operations at Dalhart, El Paso, the Gulf Coast area and in the Rio Grande Valley. These witnesses testified to the kinds of equipment used by them and to their need for the services proposed by appellees in moving their equipment to and from job sites.

There was testimony from representatives of: a Portable Bridge and Equipment Company; Suppliers; Manufacturers; Electric Companies, and Steel Companies that the proposed services were needed for the loading, unloading and transportation of the commodities listed in appellees' applications. These witnesses testified that existing services were inadequate and to the need for the equipment of appellees for loading and transportation of the commodities furnished by them. There was also in evidence photographs of equipment of appellees used for loading, unloading and transporting commodities, and also of many of the listed commodities showing their size and physical characteristics.

We cannot quote or summarize all of the evidence of the size, weight, height, width and other physical characteristics of the listed commodities however we deem the following to be fairly descriptive of them: Valves are used by refineries, chemical, sulphur and water line industries and wherever valves are used. They vary in size and kind and range in weights up to 34,000 or 100,000 pounds and many require the type of special equipment of appellees for their loading and unloading. Kelly joints which because of their weight

and length have to be handled specially in order that they will not bend or kink. Scrubbers are fifty feet in length, six feet in diameter and weigh from 20,000 to 25,000 pounds. One witness testified:

"Q. Are these items that you have enumerated, absorbers, vessels, smoke-stacks, furnaces and their component parts, heat exchangers and pressure pipe, lift equipment and steel plate for the construction of tanks of such character that may be handled or loaded by hand? A. No, they are not. They cannot be loaded by hand.

"Q. Are any special devices required for their loading? A. Absolutely.

"Q. What kind? A. They may be loaded with gin pole trucks with cranes or some quicker means.

"Q. Is that also true for the unloading? A. Absolutely."

Another commodity testified to as requiring special equipment for its loading and unloading was a rod of a core barrel. It was described as made of "a concoction of metals." The witness said a core barrel was 40 feet long and weighed less than 100 pounds.

The Commission from its own records was familiar with appellees' existing certificates; their operating experience; their financial ability, responsibility, organization and personnel; the character of vehicles to be used by them, and the probable permanence and quality of their proposed services. These records were in evidence before the Commission.

■ We hold that the Commission's order was reasonably supported by substantial evidence. The applications were all for the same character of service, the existing services were shown to be inadequate, the existence of a public necessity for the proposed services was shown and also that the public convenience would be promoted.

The Commission found that appellees were each financially able and capable of rendering the proposed services; that their equipment meets the requirements of law and the rules and regulations of the Commission, and that the proposed operations would not interfere with the use of the highways by the general public. It found:

"* * * that many industries are located outside the corporate limits of incorporated towns, and that the (regular route) carriers are now rendering adequate service on commodities of this weight (4,000 pounds) between points in the pickup and delivery limits as above described. The Commission finds from the evidence that the regular route carriers render a call and demand service in addition to their regular schedules. When there is an emergency call, or when there is a truckload movement out of the pick-up and delivery zones on commodities under 4,000 pounds, the regular route carriers can render service adequately and sufficiently to points served by them.

"* * * that the employees of the specialized motor carriers are trained to load and unload excessively heavy and large commodities; they are called upon at the point of destination to place the commodities on foundations or on top of structures; and in many instances they are required to raise towers and transport large derricks and dismantle them, and to render many other similar services which are a part of the transportation which cannot be rendered by the common carrier motor carriers. The Commission also finds that the points of origin and destination are not always on the routes of regular route carriers and that in many instances—in fact, in probably most instances—the large commodities are transported into the field off the regular highways, which is a service that cannot be rendered by the regular route carriers. Where transportation is by rail, trucks are required in most in-

stances to load at point of origin, and to unload at destination. This type of service causes delay and additional expense. Where time in transit is a factor, the rail service is inadequate as there is usually a considerable difference in the time consumed by rail and truck. The trucks consume considerably less time. Also, many of the points to be served are not on the rail lines.

"* * * that the specialized carriers have numerous vehicles, equipped with block and tackle, hoists, cranes, windlasses, gin poles, winches, and also vehicles such as lowboys and self-loading trucks and flatbed trucks, all needed in the safe and proper loading or unloading and transportation of property requiring specialized equipment. The Commission further finds that when excessively heavy, or large, commodities are to be moved from points served by the regular route carriers, it is necessary in many instances and in most instances, for the regular route carriers to employ the specialized motor carriers to load the heavy commodities at points of origin and to unload them at points of destination. This is an inconvenience in many instances to the shippers and it is an inadequate service.

"* * * that the commodities named in the applications because of their length, width, weight, height or some other physical characteristic, require the use of special devices, facilities or equipment except where some commodities such as armatures might be light and could be loaded by hand. Armatures weighing excessive amounts, of course, require specialized equipment; and it is only in instances where a commodity requires specialized equipment, or where it is an attachment or a detached part, that these applicants are authorized under the motor carrier act to transport them. * * * The specialized motor carrier act designates

pipe used in the construction and maintenance of water lines and pipe lines as a commodity which requires specialized equipment. The motor carrier act also describes as a class commodities which by reason of width, length, weight, etc., require specialized equipment for the loading or unloading and transportation. The commodities named in this record other than pipe, are named specifically; and they are commodities which, with attached or detached parts must in actuality require specialized equipment for the safe and proper loading or unloading and transportation thereof.

"* * * that public convenience and necessity require the transportation by these applicants between points within the area authorized by the existing certificates of said applicants of the commodities, subject to the restriction herein on shipments of pipe, and the commodities hereinafter specially named, which commodities require specialized equipment for the loading or unloading and transportation thereof. * * *

"The need for the service in the transportation of these commodities by specialized motor carriers to and from the sulphur plants and the fields of explorations, is clearly shown by the evidence produced at the hearing of these applications. Numerous witnesses were present from * * *" industries. (A list of such industries follows.)

We think the order of the Commission meets the requirements of 5a(d), supra.

Clearly the named commodities come within the meaning of Sec. 1(i), supra and the Commission had jurisdiction to authorize their transportation by specialized motor carriers.

Appellants' point four is overruled.

The order of the Commission is in substantially the same words as the statute, Art.

911b, Sec. 1(i), supra. Appellants' point five attacks the order not the statute.

In passing the specialized motor carrier Act in 1941, the Legislature declared it to be its policy to create a class of common carrier motor carriers to be known as specialized motor carriers to engage in the business of transporting, over irregular routes and on irregular schedules, with specialized equipment

"commodities which by reason of length, width, weight, height, size, or other physical characteristics, require the use of special devices, facilities, or equipment for their loading or unloading, and all commodities which require special facilities or special motor vehicles for adequate, efficient or safe transportation; * * *." Acts 47th Leg. 1941, Ch. 442, p. 713, Vernon's Ann.Civ. St. art. 911b note.

For the purpose of the Act the Legislature made the term "specialized equipment" inclusive of but not limited to named equipment and, as applicable here, limited the term "property requiring specialized equipment." See: Sec. 1(i), quoted supra.

The order authorizes transportation of named commodities when not moving as oil field equipment and when specialized equipment is required for the loading, unloading and transportation thereof. It also authorizes transportation in the pick-up and delivery limits of regular route carriers in incorporated cities, towns and villages "only" when such commodity weighs 4,000 pounds or more in a single piece or when because of physical characteristics other than weight the use of special devices, facilities and equipment is required for the safe and proper loading, unloading and transportation thereof. The term "special devices, facilities or equipment" is therein construed to mean "only those operated by motive or mechanical power."

In Thompson v. Railroad Commission, Tex.Civ.App., 232 S.W.2d 139, 142, reversed on other grounds, 150 Tex. 307, 240 S.W.2d 759, this Court said:

"It would have been virtually impossible for the Legislature to have named all of the commodities which require special transportation equipment. The fact that some of these were specifically mentioned does not detract from the legislative purpose. That they were named is probably accounted for by their importance and thus were readily called to the legislative mind."

The needs, demands and uses of industry are constantly changing and to meet these changes commodities must change in size, weight, length, width, height and other physical characteristics. It cannot be deemed that either the Legislature or the Commission intended to require a carrier to amend its certificate to meet every change in the needs of industry or every change in the physical characteristics of a commodity. Moreover when the words used in the order are given their ordinary meaning we think no difficulty is presented to the carriers (both regular route and specialized) or to the Commission as to what commodities may be transported under this order. The Commission is to be regarded as an expert in the field of transportation, the carriers are, at least, informed and experienced and the same may be said of persons engaged in the business of shipping commodities.

The order names the commodities to be transported. They being identified there remains only the question: Do they require specialized equipment for their safe and proper loading, unloading and transportation?

The weight of a commodity would of course present no difficulty because its weight, in a single piece, would be easy to determine, also whether it would require "motive or mechanical power" for its safe and proper loading and unloading would not be uncertain. Also we think that the height, width, length and size of the com-

modity to be transported, like its weight, could readily be classified.

The last two above mentioned commodities requiring specialized equipment for its safe and proper transportation are fair examples. The Kelly joint, to prevent it from bending or kinking. A rod of a core barrel (a core barrel being named in the order) might, of course, be loaded and unloaded without motive or mechanical power but its safe and proper loading, unloading and transportation because of its length and other physical characteristics may require specialized equipment as testified to.

█ We think the order sets out guides and standards by which appellees, and others, may clearly understand what is required of them. Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022, 1025.

█ In the trial court appellants prayed that in the event the order of the Commission was sustained then that a declaratory judgment be rendered declaring the meaning of the order and its various provisions "which are not definite, certain and measurable by any standards in the order." The failure of the trial court to do so is assigned as error. (Point 6.) These matters were presented by appellants' point 5 and in overruling that point we said the order sets out guides and standards by which parties may understand what is required of appellees and for this reason the trial court did not err in refusing to render a declaratory judgment as requested.

The trial court's findings of fact are consistent with our conclusions announced herein and appellants' requested findings would not alter those conclusions. Appellants' subsidiary points 1–A and 1–B are overruled without further discussion.

The judgment of the trial court is affirmed.

Affirmed.