Glenn HALSELL et al., Appellants,

v.

TEXAS WATER COMMISSION et al.,
Appellees.

No. 11186.

Court of Civil Appeals of Texas.

Austin.

May 27, 1964.

Rehearing Denied June 17, 1964.

State of Texas per annum by impounding between January 1, and January 1 of the following year, from Little Wichita River, a tributary of Red River in Clay County, Texas, for municipal water supply," and to cancel the Permit issued pursuant to such order.

Appellants own land in Clay County which lies within the watershed of the Little Wichita River and which adjoins such River, on both sides, above and below the site of the proposed dam to be constructed for the purpose of impounding the water to be used by the City of Wichita Falls, and a part of which land will be inundated by such impounded waters.

The order of the Commission and the Permit granted to the City of Wichita Falls authorizes the City to construct a dam at what is called the Halsell site in Clay County across the Little Wichita River and to store water at such site and to take annually up to 45,000 acre feet of such water out of the watershed of the Little Wichita River and into the watershed of the Wichita River for use in Wichita Falls.

Trial without a jury resulted in a take nothing judgment for appellants.

Appellants' first two points, jointly briefed, are, in effect, that the Permit issued to the City was void for the reason that its application (No. 2196) did not affirmatively state, as required by Art. 7590, V.A.T.S., and Commission Rule 605.1, that such water was to be taken from one watershed for use in another watershed, and that notice to such effect was not given; further that such Permit was void because the application inaccurately stated that surplus water would be returned to the Little Wichita River, and that no notice was given that such surplus water would be returned to the Wichita River.

Arts. 7508–9 and Art. 7590 provide:

"Art. 7508. Conditions of application

"Before the Board shall approve any such application [to appropriate

Hardwicke, Haddaway & Pope, Alex Pope, Jr., Larry K. Montgomery, Fort Worth, for appellants.

Waggoner Carr, Atty. Gen., F. R. Booth, Asst. Atty. Gen., Austin, H. P. Hodge, Jr. City Atty., Wichita Falls; Vinson, Elkins, Weems & Searls, Victor W. Bouldin, Houston, for appellees.

HUGHES, Justice.

Glenn Halsell and Mrs. Rosalie Halsell, individually and as executrix of the will of Furd Halsell, deceased, sued the Texas Water Commission and its members in their official capacities to cancel its order of May 4, 1962 granting application No. 2196 filed by the City of Wichita Falls "for a permit to appropriate and divert a total 63,400 acre feet of the unappropriated waters of the

unappropriated water] and issue any such permit, notice of such application shall be given substantially in the following manner:

"Such notice shall be in writing; shall state the name of the applicant and his residence; the date of the filing of the application in the office of the Board; the purpose and extent of the proposed appropriation of water; the source of supply; the place at which the water is to be stored, or to be taken or diverted from the source of supply; together with such additional information as the board may deem necessary. If the proposed use is for irrigation, such notice shall contain a general description of the location and the area of the land to be irrigated. Such notice shall also state the time and place when and where such application will be heard by the Board.

"Art. 7509. Publication of

"Such notice shall be published once in each week for four consecutive weeks prior to the date stated in such notice for the hearing of such application in some newspaper having a general circulation in that section of the State in which the source of water is located. In addition to such publication, a copy of such notice shall be transmitted by the secretary of the Board, by registered mail, addressed to each claimant or appropriator of water from such source of water supply, the record of whose claim or appropriation has been filed in the office of the Board. Such notice shall be mailed not less than twenty days before the date set for the hearing.

"Art. 7590. Application for permit

"Before any person, association of persons, corporation, water improvement or irrigation district shall take any water from any natural stream, water course, or watershed in this State into any other watershed, such person, association of persons, corporation, water improvement or irrigation district shall make application to the Board of Water Engineers for a permit so to take or divert such waters, and no such permit shall be issued by the Board until after full hearing before said Board as to the rights to be affected thereby, and such hearing shall be held and notice thereof given at such time and such place, in such mode and manner as the Board may prescribe; and from any decision of the Board an appeal may be taken to the district court of the county in which such diversion is proposed to be made, in the mode and manner prescribed in this chapter for other appeals from the decision of the Board."

Rule 605.1 of the Commission provides, in part:

"605.1 *DIVERSION FROM ONE WATERSHED TO ANOTHER:*

Where an applicant desires to divert water from one watershed for use in another watershed, the procedure to be followed is governed by the provisions of Article 7590.

(a) Documents Needed to File: Application made in the usual form and containing the matters required of other applications for a water permit, showing in addition thereto that waters will be taken from one named watershed to another named watershed.

\* \* \* \* \* \*

(c) Notice and Hearing: Notice shall be given to record appropriators in both the watershed of diversion and use, and hearing shall be held in the same manner as prescribed in other applications requesting appropriations or use of State water."

The application filed by the City with the Commission contained, in addition to the

matters above indicated, the following statement:

"Surplus water will be returned to Little Wichita River at a point which bears N 2650 ft. from the Southwest corner of Survey No. 33 (E. Brooks) as indicated on map." This point is at the base of the dam which the City proposed to build.

The notice sent out by the Commission of the City's application reads in part:

"No. *2196*

"Notice is hereby given to whom concerned that the CITY OF WICHITA FALLS, TEXAS, c/o Kenneth Johnson, Mayor, City Hall, Wichita Falls, Texas, on the 20th day of June, 1961, filed its application in the office of the Board of Water Engineers for the State of Texas, in which it applies for a permit to appropriate of the unappropriated waters of the State of Texas, from the Little Wichita River, a tributary of the Red River, in Clay County, Texas, a total of 63,400 acre feet of water annually for municipal use; and to construct an on-channel reservoir on the Little Wichita River and to impound therein 228,000 acre feet of water, all being more fully set out in said application.

"The proposed dam is located at a point which bears north 1000 feet from the southwest corner of E. Brooks Original Survey No. 33, on the east bank of the Little Wichita River in Clay County, Texas, and is distant in a southwesterly direction from Henrietta, Texas, approximately ten (10) miles; and which site is generally referred to as the 'Halsell Site.' "

It was stipulated that this notice was "sent to everyone to whom, under any theory, it should have been and could have been sent."

Assuming that two watersheds are involved here, it is apparent that neither the application nor notice complied with Rule 605.1 of the Commission requiring that the application show "that waters will be taken from one named watershed to another named watershed."

It is the position of the Commission that this rule has been construed by it to apply only where the diversion of water is to be from one river basin to another river basin and that it is inapplicable when the proposed diversion is from one sub-basin or tributary to another sub-basin or tributary of the same river. In this instance the Little Wichita and the Wichita Rivers are both tributaries of the Red River. Evidence was offered by the Commission of its departmental construction of this rule as indicated. Mr. John J. Vandertulip, Chief Engineer of the Texas Water Commission testified on this point as follows:

"Q * * * Mr. Vandertulip, from your personal experience and knowledge as Chief Engineer of the Texas Water Commission, does the Texas Water Commission consider the diversion of water from the specific situation we have here, of the Little Wichita into the Big Wichita, the Wichita, as an inter-basin diversion of water or diversion of water in this area?

"A No. In our staff work, whenever an application is received, we look at all of the watershed, all of the river basin downstream from this point in question, so that we might properly notify any downstream users. The Red River Basin, of course, the Red River is an interstate stream, is a boundary stream, or—let me use the Brazos River as an example. If we have an application for a reservoir or a tributary of the Brazos River, we do not consider that as a separate watershed, but carry that and notify all parties down-stream on the main stem, because that water will flow down

to that, so our concept of watershed is the entire river basin.

"Q Now, Mr. Vandertulip, in your experience with the Texas Water Commission, can you state whether or not all, if not—or most all applications or permits granted by the Commission involve a diversion of water from some smaller tributary of a major watershed into another tributary of the same watershed?

"A When we think of watershed as basin, yes. This is the case."

Rule 605.1 would serve no additional purpose, as to notice, if applied to the present case because under the regular notice practice of the Commission notices are always sent to down-stream appropriators from the same stream, in this instance the Red River. The purpose of this rule was to provide for notice that but for such rule would not be given, i. e. where water is diverted from one river basin to another river basin.

■ Actually, appellants do not complain of the notice, per se. They attack the application upon which the notice is based. The application was defective in that it did not name the two watersheds. It did, however, give information from which these facts could be derived. The Little Wichita River was named as the donor watershed. Water from it was to be used by the City of Wichita Falls. Lacking only was the name of the Wichita River as the donee watershed. This was a commonly known physical fact about which there could be no dispute. We are not inclined to hold that this defect is fatal to the validity of the proceedings in the absence of any showing that appellants have been harmed as a result.

The other alleged defect in the application is that the point of return of "surplus" water was incorrectly given. This point is stated in the application to be at the base of the dam. The Permit issued pursuant to this application provided, in part:

"All water diverted hereunder except that which is consumed as a consequence of the reasonable and beneficial use thereof for the purpose specified herein shall be returned to the Wichita River, Red River Basin, at the existing sewage treatment plants of the City of Wichita Falls. Before establishing any additional point or points for the discharge of such return water, the permittee shall obtain the approval of the Commission."

Art. 7579, V.A.T.S. provides:

"Art. 7579. Surplus water

"All surplus water taken or diverted from any running stream and not used by the appropriator or disposed of to consumers for the purposes stated in this chapter shall be conducted back to the stream from which taken or diverted, wherever such water may be returned by gravity flow, whenever reasonably practicable."

Rule 215.9 of the Commission provides:

"Rule 215.9 *SURPLUS WATER RETURN POINT:* All applications shall describe the point at which surplus water will be returned to the stream with reference to a corner of an original land survey; this must also be clearly shown on the accompanying map."

Rule 115.1(i) of the Commission defines "return water" and "return flow" as follows:

"Return water or return flow is the portion of water diverted from a water supply in excess of the consumptive use."

On this point we quote from the testimony of Mr. Vandertulip:

"Q Mr. Vandertulip, is it not a fact in connection with irrigation systems that you normally have

rather substantial canals and a substantial amount more of water is pumped into this canal from which diversions are made into the fields than is actually ever diverted from the main canal system?

"A Yes. This is an operational problem on an irrigation system, and you often have water in the ditches that is not used, and it is routed back to the main stream channel through a wasteway.

"Q Mr. Vandertulip, I asked you about the language Mr. Pope just read to you from the permit. I notice that this uses the language 'return water that is not put to reasonable and beneficial use.' Now, in your opinion, is the type of water here water that has been pumped, gone through the city's system and then treated, and labelled here as 'return water,' is the same type of water as what you would normally consider to be surplus water?

"A No, I wouldn't call it surplus water."

█ In conformity with the expert opinion of Mr. Vandertulip we hold that water which has been used and processed by the City of Wichita Falls is not "surplus" water within the meaning of Art. 7579. It will be "used" water. It will have been disposed of to consumers for the purposes authorized by law and the Commission. There is, then, no statutory requirement that this water, if such it be, be returned to the Little Wichita. We quote, for its argumental value, the following from the brief of appellee, City of Wichita Falls:

"It will be noted that this statute [7579] applies only to 'surplus waters' which are 'not used by the appropriator or disposed of to consumers.' It does not apply to sewage effluent or other residual waters which will be used by the City of Wichita Falls or disposed of to its customers, commonly called 'return waters.' It is absurd to contend that the City of Wichita Falls will pump water from the Little Wichita for a distance of 11 miles over the ridge into the big Wichita tributary of the Red River and, without either using it or selling it to customers, dump it as unused 'surplus water.' The only surplus water in the Halsell reservoir which will not be used by the City of Wichita Falls or sold to its customers will be that which spills over the spillway of the dam or passes through the sluice gate at the bottom of the dam. This is the point stated in the application. Return flows from waters which are used by the City or its customers will pass through the City's sewer system and return to a Red River tributary at the present or future locations of the City's sewage treatment plants. This is in keeping with the law and the terms of the permit."

█ Appellants appeared before the Commission at the hearing on the application made by the City of Wichita Falls, filed written pleadings and were represented by counsel. If there are any defects in the application made by the City, we are of the opinion that appellants have sustained no harm or prejudice therefrom. For this reason and for all the reasons stated above we overrule appellants' points one and two.

Appellants' third point is that the action of the Commission in the premises is arbitrary, capricious, not supported by substantial evidence and will result in waste of land and water and does not allow optimum development of the public waters of the Little Wichita River is detrimental to the public welfare, unlawful and is to the prejudice of persons and property in the watershed of the Little Wichita River.

There is no denial that the City of Wichita Falls is pursuing a proper and prudent

course in acquiring additional water for its present and future needs. Neither is there a denial that the water of the Little Wichita River is the most desirable obtainable. In fact appellants say, "the characteristics of the Little Wichita River are such that it is an oasis of good water surrounded by water of greatly inferior quality and is the only sizeable source of good water remaining to be developed in the area."

Appellants also say that, "The controlling factor is whether in the proper and optimum development of the Little Wichita River, a reservoir at Halsell [which was authorized by the Commission] or a reservoir downstream at Ringgold [as earlier authorized by the Commission] will (1) produce or "yield" more water for the State, and (2) use less land." Both reservoir sites are in Clay County.

Appellants' land would not be taken if the Ringgold site had been approved. Appellants' land, or a portion if it, will be taken if the chosen site at Halsell is sustained.

We will excerpt from the substance of the testimony upon which appellants rely to sustain these points.

Mr. Robert Gooch, a registered professional and highly qualified engineer testified for appellants. He gave this summary of his comparison between the two sites:

*"Alternatives for Development of the River*

There are two alternatives for development of the Little Wichita river. One is to build first the Halsell Reservoir, controlling some 46% of the now undeveloped portion of the watershed, followed at a later date by a medium-size reservoir at the Ringgold site near the mouth of the river. The other approach is to build a 164,000 acre-foot reservoir at the Ringgold site initially and to enlarge that reservoir to 433,000 acre-feet when required to obtain full basin development. The alternatives are as follows:

| | Halsell | Halsell Ringgold System | Ringgold First Stage | Ringgold Final Stage |
|---|---|---|---|---|
| Net Drainage Area (Sq. Mi.) | 557 | 1,202 | 1,202 | 1,202 |
| Capacity (Acre-Feet) | 228,000 | 458,000 | 164,000 | 433,000 |
| Water Surface Area (Acres) Spillway Level | 13,000 | 26,400 | 10,700 | 21,000 |
| Dependable Yield in 1980 (MGD) * | 27.5 | | 23.6 | |
| Dependable Yield in 2010 (MGD) * | | 53.4 | | 64.0 |

Both alternatives would provide as much conservation storage as is necessary or justified on the Little Wichita river. The two-reservoir approach, however, based on lakes at both the Halsell and Ringgold sites,

* Million gallons of water per day

would produce 10.6 MGD less yield. This is because of the greater reservoir surface area involved and the resulting higher evaporation losses. In either case, Wichita Falls area will need the full supply available from the Little Wichita river before the end of this century."

The engineer who designed the proposed dam at Halsell did not study the Ringgold site. He just designed the best dam he could for the Halsell site. The Halsell site was selected by a New York engineer not licensed in Texas. He first recommended the Ringgold site. He then went to the Halsell site with a rancher who objected to the Ringgold site. Two months later he changed his recommendation to the Halsell site. This engineer testified that the scope of his employment by the City of Wichita Falls did not require him to consider the optimum development of the Little Wichita.

Appellants point to testimony that 13,000 acres of land would be needed for the dam at Halsell, whereas only 10,700 acres would be needed for the first stage dam at Ringgold. They also point to testimony that even if the dam is located at Halsell it will become necessary in the future to build a dam at Ringgold and the land required would be 5400 acres more than a single dam at Ringgold.

We quote the following from appellants' brief, which has support in the record:

"The total productivity or yield of a dependable supply of water from the proposed reservoir at Halsell (plus the later supplemental reservoir at Ringgold) is ten million gallons of water a day less than the yield of a single reservoir at Ringgold. The ten million gallons of water a day loss by building at Halsell instead of Ringgold is about what Wichita Falls now uses."

Appellants also cite evidence of the losses in ad valorem taxes which would result from the condemnation of more land than is required if the Halsell location is sustained and other losses which would occur if this land is withdrawn from commercial uses.

We quote from appellants' brief as follows:

"There was no testimony by appellees that the diversion from the Little Wichita river would not prejudice 'any person or property' within the Little Wichita watershed. There was no testimony by appellees that the remaining water of the Little Wichita river would not be needed in the Little Wichita watershed. The history and presumption of the statute is that diversions cause prejudice, and appellees did not attempt, much less succeed, to prove no 'prejudice.'"

The statute referred to is Art. 7589, V.A.T.S., which reads:

"Art. 7589. Unlawful to divert water

"It shall be unlawful for any person, association of persons, corporation, water improvement or irrigation district to take or divert any of the water of the ordinary flow, underflow, or storm flow of any stream, water course, or watershed, in this State into any other natural stream, water course or watershed, to the prejudice of any person or property situated within the watershed from which such water is proposed to be taken or diverted."

Appellees called four expert witnesses, as follows: Mr. John Ruhmann, director of utilities of the City of Wichita Falls, who testified in regard to the City's present water supply and distribution system, the defeat of the Ringgold bond election, the success of the Halsell bond election, and the urgent need for an additional water supply for the City and its inhabitants; Mr. Alfred C. Leonard, a partner in the firm of Malcolm Pirnie Engineers of New York, who testified in regard to engineering and hydrological matters and introduced his firm's

engineering report prepared for the City of Wichita Falls. Mr. Homer A. Hunter of Dallas, who was employed by the City of Wichita Falls as engineer on the Halsell project and who testified in regard to engineering and hydrological matters and who proved up his engineering report to the City of Wichita Falls; and Mr. A. H. Woolverton of Austin, formerly chief engineer for the Board of Water Engineers, who was employed as a consultant to Homer A. Hunter Associates and who testified in regard to topographic and hydrological matters and proved up his report showing that the Halsell project would lose less water by evapotranspiration than the Ringgold project. Appellants' witness Robert S. Gooch agreed that the Halsell project as planned by the City of Wichita Falls fully develops the site, that it is a feasible project both from an engineering and hydrological standpoint and would satisfy expected water needs of the City of Wichita Falls for at least 25 years.

The undisputed evidence shows that the Ringgold site, for which appellants contended, is 27.7 miles from Wichita Falls, whereas the Halsell site is 11 miles from the City. The undisputed evidence further shows that the proposed initial pipeline from the Ringgold site would be 22 miles long in the early stages and would have to be increased to 27.7 miles if the reservoir is enlarged, whereas the proposed pipeline from Halsell is, and would remain, only 11 miles long. The cost of pumping water from the Ringgold site would be approximately double the cost of pumping water from the Halsell site. Mr. Leonard testified that the Halsell project would cost $2,100,000 less than the initial Ringgold project and that the estimated construction cost per million gallons of water per day of dependable yield would be $165 at Halsell and $195 at Ringgold.

The uncontradicted evidence also shows that Malcolm Pirnie Engineers, an outstanding firm with an international reputation, made a complete study of all of the available sources of additional water supply for the City of Wichita Falls and recommended the Halsell site; that the voters of the water district in which Wichita Falls is situated rejected the Ringgold project; and that the voters of Wichita Falls approved the Halsell project.

Mr. Gooch, appellants' witness and Mr. Leonard, appellees' witness, testified that it was economically necessary to purchase all land for the Ringgold project when the first stage was constructed, even though land for the second stage might not be needed for 25 or 30 years. This is because development around the lake would make the cost of the second-stage land prohibitive if not purchased when the project is started. Mr. Gooch fixed the required Ringgold acreage at 21,000 acres, while Mr. Leonard testified that 24,000 acres would be required. Mr. Gooch fixed the required acreage at Halsell at only 13,000 acres and Mr. Leonard at 14,000 acres.

If, as appellants contend, a small reservoir at Ringgold will be needed in 25 or 30 years to supplement the supply from Halsell, the land required for both projects would be 23,700 acres, of which 10,700 acres for the small Ringgold project would not be required until the early part of the 21st Century. Therefore, even under appellants' theory, 21,000 or 24,000 acres of land would be taken off the tax rolls immediately if the Ringgold project is built and only 13,000 acres if the Halsell project is built.

Appellants offered proof that if, in the early part of the 21st Century, it becomes necessary to build another small reservoir at the Ringgold site to supplement the water supply from the Halsell reservoir, evaporation losses at the two reservoirs would be some ten million gallons per day more than if a single Ringgold project were built. However, this was denied by Mr. John Vandertulip, chief engineer for the Texas Water Commission, and by Mr. A. H. Woolverton, former chief engineer for the Texas Board of Water Engineers.

We quote the testimony of Mr. Vandertulip in this regard:

"Q You heard Mr. Gooch's testimony to the effect that in his opinion, according to his criteria, that the construction of the Halsell and small Ringgold Project would effect in time a net loss of about 10½ million gallons a day through evaporation?

"A Yes, sir, I heard his testimony.

"Q Over the single Ringgold Project?

"A Yes, sir.

\* \* \* \* \* \*

"Q From your studies of the flow records at the two gauges [on the Little Wichita] during the thirty-six-month period testified to and from your studies of the data and information that was presented under oath to the Water Commission in regard to losses and to the phreatophytes in the Basin of the Halsell reservoir, did you reach a professional opinion as to the relationship of the losses that would be salvaged by the construction of the Halsell reservoir in relation to the losses that Mr. Gooch testified to, at 10½ million gallons per day, about which I just asked you?

"A Well, that was a rather extensive question, sir. I would like to take it in parts.

"Q All right, sir, if you will.

"A First, our reviewed analysis of the data corroborated the testimony that had been presented in the hearing, in that some 13,000 acre-feet of channel losses occurred annually between the two gauge stations. This is an approximate number. It is of that, oh, plus or minus a few hundred acre-feet. We have previously in our May 2nd memorandum determined that the difference in yields, reservoir yields between the Halsell-Small Ringgold combination, as opposed to the Ringgold, was of the order of 10,500 acre-feet difference. After—Halsell reservoir would be —would cover the area where these channel losses are taking place, and, therefore, in the future the losses would not occur.

"Q If the Halsell were built?

"A If Halsell were built. If just Ringgold were built, you would still have the channel loss condition occurring. That being the case, the construction of Halsell reservoir would actually salvage these losses that were taking place in the present condition of the channel, or the condition as of 1953 to 1956, and, therefore, there would not be a loss of water, if Halsell were constructed first and Ringgold at some later time.

"Q The amount of water salvage that is now being lost, and will continue to be lost if Halsell is not built and Ringgold is built, at least equals or exceeds the losses that Mr. Gooch determined to exist between the two combinations, is that correct, in your opinion?

"A Well, his difference, as I recall this morning, was 10½ million gallons a day, which is of the order in round numbers, 12,000 acre-feet a year, so it is about the same. The salvage would be plus a thousand acre-feet.

"Q Then, is it your professional opinion that the construction of the Halsell Project, and perhaps at some time the later construction of the small Ringgold would not result in a net loss of water to the State of Texas?

"A That is my professional opinion, yes, sir.

"Q Over the use of Ringgold alone?

"A That is correct.

"Q Now, Mr. Pope yesterday seemed somewhat concerned about the statement that I had made that the way to get rid of the phreatophyte loss was to drown the trees and vegetation. Would you comment on that, as to whether that is a proper procedure?

"A I participated in the investigation on the McClellan Reservoir Delta along the Pecos River in New Mexico, which is infested with both salt cedar and willows. We had seven tracts of some 500 acres in each tract, in which we attempted to use chemicals of various types to eradicate the salt cedar and willows. We used several different types of inflammable material to attempt to burn these phreatophytes. The results were a temporary stoppage, a matter of months, to as much as a year in phreatophyte growth, and then it came back. Then we also tried to clear reservoir—a channel of these phreatophytes, by root plowing. This was done on the Rio Grande Basin, and constant maintenance is required to keep the phreatophytes from coming back in. The only known way that we have found to kill the phreatophytes is by covering them at least two foot deep with water and preferably covering them entirely.

"Q What happens when you do that?

"A You—by having water stand at least two foot deep over the plants entirely, you take—you will gradually dissipate all of the oxygen in the soil, and no air being in the soil, you will eventually kill them. The water has to stand on them for at least a year's time.

"Q You literally drown them?

"A That is correct.

"Q That is the most effective way to get rid of them?

"A That is the only effective way I know of.

"Q Then, if Halsell is constructed and the phreatophyte area is covered, in your professional opinion, that would eliminate the losses that are now occurring?

"A Yes, sir.

"Q And would result in at least an equal savings to that of the losses about which Mr. Gooch testified in favor of the Ringgold site?

"A That is correct."

Lake Kickapoo, also on the Little Wichita, is a primary source of water for Wichita Falls. There is evidence that the so-called tandem use of this lake with the proposed lake at Halsell would yield more water than the use of such lake with the proposed lake at Ringgold, this because the Ringgold site is further from Lake Kickapoo than the Halsell Lake would be when created. On this point we quote the testimony of Mr. Vandertulip:

"Q Mr. Vandertulip,—the Halsell permit, speaks of a joint reporting of diversions and storage and so forth of Lake Kickapoo and Halsell together. Is there any advantage, hydrologically speaking, from the standpoint of a water supply, in operating two reservoirs on the same stream in tandem fashion and coordinating the operation?

"A Yes, very definitely. By being able to select the water out of

either of the reservoirs, depending on whether inflow came into one or the other reservoir, you could maintain by the system operation the best yield possible, and that yield would be greater than the yield of the two individual reservoirs.

"Q I believe the evidence shows in Mr. Gooch's testimony that that tandem operation would result in about 3,000,000 gallons a day additional yield. Have you made any study of that?

"A I have reviewed this. I haven't made a detailed study of it, but that order of magnitude of 3,000,-000 gallons a day would seem very reasonable for the other detailed operations that I have done under similar situations.

"Q Now, Mr. Gooch seems to give no significance to that. In your opinion, is that significant saving?

"A Well if you don't have to put up any additional facilities, and you get 3,000,000 gallons a day more out of it, yes, sir, it is a significant saving.

"Q Now, is the proximity of Halsell to Kickapoo an element in making that work, in making the tandem operation efficient?

"A Yes, sir.

"Q Would you get the same good benefits in a tandem operation at Kickapoo and Ringgold?

"A No, sir, they are widely separated."

There is a wide range (125,000 to 400,-000) in the estimates of the projected population of the City of Wichita Falls and its suburbs through the year 2000. The Commission, however, does not project, at this time, populations beyond the year 1980, because they consider more distant projections unreliable. Taking an in between estimate of a population of 200,000 in the year 2000, the anticipated yield of water from present sources and the proposed lake at Halsell there would arise no necessity during the interim of an auxiliary dam at Ringgold.

We are completely satisfied that the order of the Commission and Permit 2015 issued pursuant thereto is reasonably supported by substantial evidence. The field in which this controversy arises is highly technical and the decisions of the expert body lawfully constituted to resolve such controversies have, and should have, extraordinary weight with the Courts in passing upon their validity. We find no semblance of arbitrary or capricious action on the part of the Commission and we sustain the solution of this difficult problem made by the Commission after a sixteen day hearing and a thorough and painstaking consideration of all relevant factors suggested by the parties.

We turn now to the contention that action of the Commission is unlawful and to the prejudice of persons and property in the watershed of the Little Wichita River.

Art. 7590, copied herein, plainly and by explicit terms authorizes the diversion of water from any natural stream, water course, or watershed in this State to any other watershed and it establishes the procedure to be followed by the applicant therefor and the Board (Commission).

Art. 7589, also copied herein, makes it unlawful to divert water from one watershed to another watershed "to the prejudice of any person or property situated within the watershed from which such water is proposed to be taken or diverted."

Unless these articles, enacted at the same time and in the same legislative act (Acts 1917, p. 211, Secs. 80–81) cancel each other, and in our opinion they do not, then they must be reasonably construed to give effect to both.

The Legislature has been very careful to provide that the Commission may not impair vested private or property rights. Arts. 7469, 7515a, 7620, V.A.T.S. The permit issued to the City of Wichita Falls provides, in part, "The permittee shall store only appropriable public waters of the Little Wichita River, subject to all rights of holders of superior and senior water rights downstream."

■ Appellants own private and vested property and property rights which will be appropriated by the City of Wichita Falls under its power of eminent domain in the event it pursues its permit to build a dam at Halsell. We do not consider this eventuality as constituting legal prejudice to such property, property rights or their owners. The reason for this is that such property or property rights may not be taken by the City except upon the payment of adequate consideration.

■ The only evidence referred to by appellants as constituting prejudice to persons or property situated within the Little Wichita watershed is that previously discussed relating to the wastage of water and the use of an excessive amount of land. We need not review that evidence. It is reasonably susceptible of the construction that no water will be wasted and an excess amount of land will not be utilized by the location of the dam at Halsell. We, therefore, hold that the Commission did not err in failing to find that the application of the City should be denied because it would unlawfully result in prejudice to persons and property in Little Wichita watershed. We do no trench upon the future and attempt to define the import of Art. 7589 upon facts not presently before us. Point three is overruled.

Points four and five, jointly briefed, are that the Trial Court erred in trying this case under the substantial evidence rule and denying appellants a jury trial, as demanded, and also in denying them independent finding of facts as they deem required by Art. V, Sec. 10, Constitution of Texas, Vernon's Ann.St. and Arts. 7590, 7567 and 7568, V.A.T.S.

Art. V, Sec. 10 of our Constitution provides that in the trial of all causes in the District Court the parties, upon proper demand, shall have the right of trial by jury.

Arts. 7567–8 read:

"Art. 7567. May appeal to appellate court, when

"If any person, firm, association of persons, or corporations engaged in furnishing water, or other persons at interest be dissatisfied with the decision of any rate, charge, order or act of regulation adopted by the board, such dissatisfied company or party may file a petition setting forth the particular cause or causes of objection to such decision, act, rule, rate, charge or order, or to either or all of them, in a district court of Travis County, against said board as defendant. Said action shall have precedence over all other causes on the docket of a different nature, and shall be tried and determined as other civil causes in said court. Any party to said action may appeal to the Appellate Court having jurisdiction of said cause; and said appeal shall be at once returnable to said Appellate Court at any term thereof; said action so appealed shall have precedence in said Appellate Court of all causes of a different character therein pending; provided that if the court be in session at the time such right of action accrues, the suit may be filed during such term and stand ready for trial after ten days notice.

"Art. 7568. Proof rests upon plaintiff

"In all trials under the foregoing article the burden of proof shall rest upon the plaintiff, who must show by clear and satisfactory evidence that the rates, regulations, acts, orders, or charges complained of are unreasonable and unjust to it or them."

Art. 7590, previously quoted, provides that an appeal may be taken from the order of the Board (Commission) in diversion cases, such as this case, to the District Court of the County in which such diversion is proposed to be made.

Art. 7590 was a part of the 1917 Act. Arts. 7567 and 7568 were enacted in 1918, Acts 4th C.S., 1918, p. 129, Secs. 64–a, 64–B.

This suit was expressly filed in Travis County under Art. 7477, Sec. 12, which reads:

"(12) Any person affected by any ruling, order, decision, or other act of the Board, may, within one hundred and twenty (120) days after the date on which such act is performed, or, in case of a ruling, order, or decision, within one hundred and twenty (120) days after the effective date thereof, file a petition in an action to review, set aside, modify, or suspend such ruling, order, decision, or other act. Or any party affected by the failure of the Board to act in a reasonable time upon an application to appropriate water, or to perform with reasonable promptness any other duty imposed by this Chapter, may file a petition in an action to compel the Board to show cause why it should not be directed by the court to take immediate action. The venue in any or all such actions is hereby fixed exclusively in the District Court of Travis County, Texas."

We hold that this suit was properly filed in the District Court of Travis County. It is not necessary that we determine whether or not it could have been filed in the County of diversion. We do hold that Art. 7590 is not jurisdictional in the sense that appeals of the nature therein described can only be filed in the County of diversion and that the District Court of Travis County is without jurisdiction of such appeals or suits. We also hold that

Art. 7590, construed as a venue statute, does not fix exclusive venue in the County of diversion. We arrive at these conclusions by abiding by the rule which looks on repeals by implication with disfavor and by applying the rule that general and special statutes should be read together and harmonized, if possible. If, however, there is irreconcilable conflict between Arts. 7590 and 7477, which we do not find, we would be inclined to hold that Art. 7477, being later in point of time,[1] expresses the present legislative intent, and should prevail.

In holding that this case was properly tried under the substantial evidence rule and that appellants were not entitled to a jury, although properly demanded, we quote from and adopt the following portion of the brief filed by the City of Wichita Falls:

"Appellants' contention that they were entitled to a jury trial and that the trial court erred in applying the substantial evidence rule to this case are concluded against them by the opinion of this Court and the Supreme Court in Southern Canal Company v. State Board of Water Engineers [159 Tex. 227], 318 S.W.2d 619 (1958). That decision controls this case.

"It was a suit to set aside an order of the Board of Water Engineers denying the Canal Company's application for a permit to impound and appropriate waters of the Trinity River and to divert such waters into the San Jacinto River watershed for use in Harris County. In affirming this Court's holding that this type of suit must be tried under the substantial evidence rule, the Supreme Court reviewed the controlling statutes at length and fully discussed the nature of a suit attacking an order of the Water Commission (Board). The Court pointed out the inconsistencies in Section 13 of Article 7477 and held

1. Acts 1953, 53rd Leg., p. 874.

that the true question to be decided by the courts in this type of case is the reasonableness of the Board's order and said (p. 623):

" 'If the issue to be decided and on which evidence is to be heard is the reasonableness of the Board's order, decision by the courts cannot be made upon facts found on the trial as in other civil cases and under rules of procedure applicable in other civil cases (jury trial), for the question to be decided is a question of law. Thomas v. Stanolind Oil & Gas Co., 145 Tex. 270, 198 S.W.2d 420, 421; Jones v. Marsh, supra; (148 Tex. 362, 224 S.W.2d 198); Board of Firemen's Relief & Retirement Fund Trustees of Houston v. Marks, 150 Tex. 433, 242 S.W.2d 181, 183, 27 A.L.R.2d 965; Hawkins v. Texas Company, 146 Tex. 511, 209 S.W.2d 338, 340. If the issue to be decided and on which evidence is to be heard is the reasonableness of the Board's order, decision cannot be made from a preponderance of the evidence or entirely free of the substantial evidence rule, for the legal test of the reasonableness of an order of an administrative agency is whether it is reasonably supported by substantial evidence and not whether it is supported by a preponderance of the evidence. Thomas v. Stanolind Oil & Gas Co., supra; Hawkins v. Texas Company, supra; Board of Firemen's Relief, etc., v. Marks, supra.' "

The court also said (p. 622):

" 'The major side effects of a trial under the substantial evidence rule are that the only issue to be decided is one of law and trial of the fact issues by a judge or jury is avoided.'

"Appellants' contention that they are entitled to a jury trial under Article V, Section 10 of the Constitution of Texas is unsound for two reasons. First, as held in Southern Canal, there is no fact question to be decided, the only question being one of law. This is not a confiscation suit or anything more than an appeal from an order granting the State's permission to impound and use public waters. Second, it is well established that the right of trial by jury as guaranteed by the Constitution of Texas is limited to the right as it existed at common law, or as provided by statutes, in effect when our Constitution was adopted in 1876. White v. White, 108 Tex. 570, 196 S.W. 508 [L.R.A.1918A, 339]; Hammond v. Ashe, 103 Tex. 503, 131 S.W. 539; Burkhalter v. Canyer, 9 S.W.2d 1029 (Comm.App.); Pittman v. Byars [51 Tex.Civ.App. 83], 112 S.W. 102 (approved in Burckhalter); Hickman v. Smith [Tex.Civ.App.], 238 S.W.2d 839 (writ ref.). Suits of this character were, in 1876, and are now, unknown to the common law. Motl v. Boyd, 116 Tex. 82, 286 S.W. 458, 475 (Point 19); City of Strawn v. Board of Water Engineers [Tex.Civ.App.], 134 S.W.2d 397 (error ref.). The act creating the Board of Water Engineers was not passed until 37 years after the adoption of the Constitution in 1876, and Article 7477, which authorizes this type of suit, was not enacted until 77 years after the Constitution was adopted. Article V, Section 10 of the Constitution has no application to this type of suit."

Appellants cite Texas and New Orleans R. R. Co. v. Railroad Commission, 155 Tex. 323, 286 S.W.2d 112, and other similar cases to support their demand for a jury and an independent factual judicial review. These cases involve the reasonableness of transportation rates and fall into a category which has received separate treatment by the Courts. This case is not a rate case. Points four and five are overruled.

■ Point six is that the Trial Court erred in refusing to admit in evidence the

record of the hearing before the Commission which was offered for the limited purpose of showing that there was no evidence of controlling factors before the Commission when it entered the order and issued the permit in suit.

The Court did not err in this respect. The record made at the hearing was not admissible. Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022, Cook Drilling Co. v. Gulf Oil Corp., 139 Tex. 80, 161 S.W.2d 1035, Miller v. Tarry, 191 S.W.2d 501, Austin Civil Appeals, writ ref., n. r. e. See Kavanagh v. Holcombe, 312 S.W.2d 399, Houston Civil Appeals, writ ref., n. r. e., for an excellent discussion of the question and pertinent authorities. Point six is overruled.

 Point seven is that the Trial Court erred in not holding Permit No. 2015 void for the reason that the Commission did not comply with Sec. 4(h) Art. 7477 which provides that the Chief Engineer of the Commission " * * * shall be responsible to the Commission * * *" for "(h) Reviewing, analyzing and making recommendations to the Commission in regard to presentations filed under Article 7496, Vernon's Annotated Texas Civil Statutes; all applications to the Commission for permits, or amendments thereto, to appropriate public waters and/or to construct works for the impoundment, diversion and transportation of public waters; and all applications, or amendments thereto, to construct and operate waste disposal wells."

Mr. Vandertulip, the chief engineer for the Commission, testified that he and his staff made a very extensive study of the Halsell project and prepared a comprehensive written report to the Commission entitled "Study of Firm Yield Water Supply Development Potential of the Little Wichita River as Afforded by Lake Kickapoo, the Halsell Reservoir Site as Proposed in an Application by the City of Wichita Falls and the Ringgold Reservoir Site," which was submitted to the Commission. He further testified that Mr. McDaniel, one of the

Commission's engineers who is head of the hydrology section, attended most, if not all, of the hearings before the Commission and conferred with members of the Commission from time to time in regard to the testimony presented at the hearings. Mr. Vandertulip also conferred with members of the Commission during the course of the hearings in regard to such testimony.

After the hearing before the Commission, neither the Chief Engineer nor any member of his staff evaluated the testimony presented at the hearing for the Commission nor did they subsequent to the hearing make any recommendation to the Commission concerning the matter.

This record shows no dereliction of duty by the Chief Engineer or his staff. Contrarily, it shows full, faithful and efficient discharge of the responsibility placed by statute upon the Chief Engineer. His responsibility is to the Commission and, in our opinion, the Commission, and only the Commission, can complain of any irresponsibility on the part of the Chief Engineer. Point seven is overruled.

Point eight is that the Trial Court erred in permitting Mr. Vandertulip to answer a question which has been quoted herein regarding his professional opinion as to water losses caused by phreatophytes which would be salvaged by construction of the Halsell dam over objection of hearsay and that the witness was permitted to testify concerning the state of the evidence heard by the Commission, which evidence was itself inadmissible.

 Mr. Vandertulip was testifying as an expert and it is permissible to assume facts in evidence in formulating questions to expert witnesses when an expert opinion is sought.

 Assuming that appellants made the proper objection to this question and answer, we hold that the error, if any, is harmless since Mr. A. H. Woolverton, a registered professional engineer, subse-

quently testified at length and without objection to the nature of vegetation and trees in the Little Wichita River Valley and their water consuming capacity. Point eight is overruled.

Finding no reversible error, the judgment of the Trial Court is affirmed.

Affirmed.