TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN





NO. 03-96-00209-CV





City of Austin, Appellant


v.


City of Cedar Park; and Wilson Land and Cattle Company, Appellees





FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL
DISTRICT

NO. 95-317-C368, HONORABLE BURT CARNES, JUDGE PRESIDING 





 The City of Austin ("Austin") appeals a declaratory judgment upholding the constitutionality
of Senate Bill 421, enacted during the 1995 regular session of the Texas Legislature and now codified as
section 42.024 of the Texas Local Government Code. (1) See Tex. Loc. Gov't Code Ann. § 42.024 (West
Supp. 1997). In a single point of error, Austin contends section 42.024 is a local law regulating the affairs
of Austin in violation of article III, section 56 of the Texas Constitution. We will reverse the trial court's
judgment.


FACTUAL AND PROCEDURAL BACKGROUND


 In 1963, the Texas Legislature enacted legislation to resolve conflicting claims between
expanding cities. See Municipal Annexation Act, 58th Leg., R.S., ch. 160, art. I, 1963 Tex. Gen. Laws
447 (since repealed and codified at Tex. Loc. Gov't Code Ann. §§ 42.001-.902 (West 1988 & Supp.
1997)); see also City of Waco v. City of McGregor, 523 S.W.2d 649, 653 (Tex. 1975). The legislature
declared that extraterritorial jurisdiction ("ETJ") would be designated in order to further the state's policy
of promoting and protecting the general health, safety, and welfare of persons residing in and adjacent to
municipalities. See Tex. Loc. Gov't Code Ann. § 42.001 (West 1988) (hereinafter "Code"). Thus, a
municipality is granted as its ETJ a designated amount of unincorporated area adjacent and contiguous to
the municipality's corporate boundaries. Code § 42.021 (West 1988). The area designated as a
municipality's ETJ is determined by the municipality's population. The statutorily defined ETJ ranges from
one-half mile for municipalities with fewer than 5,000 inhabitants to five miles for municipalities with
100,000 or more inhabitants. Id. In the case of neighboring cities, however, these rules do not always
work harmoniously due to overlapping ETJ areas. In these situations, the legislature has provided for
modification of the ordinary statutory ETJ's to resolve conflicting claims. See Code § 42.903 (West Supp.
1997).

 The Code also establishes procedures to be followed when an existing municipality's ETJ
is reduced or expanded. In general, a municipality's ETJ cannot be reduced unless its governing body
consents to the reduction in writing. (2) Code § 42.023 (West 1988). Likewise, the expansion of one
municipality's ETJ through annexation, request, or increase in the number of inhabitants cannot include any
area that extends into the existing ETJ of another municipality. Code § 42.022(c) (West 1988). Senate
Bill 421, now codified as section 42.024 of the Code, creates a limited change in the legislative rules
governing municipal transfers of ETJ.

 Unlike other provisions of the Code, section 42.024 permits a municipality to compel the
transfer of ETJ if the statute's idiosyncratic requirements are met. The statute provides that in particular
circumstances a portion of the ETJ of a "releasing municipality" must be transferred into the ETJ of an
"adopting municipality." An adopting municipality includes any home-rule city with a population of less than
25,000 that purchases and appropriates raw water through a transbasin diversion permit from one or two
river authorities in which the municipality has territory. Code § 42.024(a)(1) (West Supp. 1997). A
releasing municipality includes any home-rule city with a population exceeding 450,000 that owns an
electric utility, has a charter provision allowing for limited-purpose annexation, and has annexed territory
for a limited purpose. Code § 42.024(a)(2).

 The adopting municipality may force the transfer of an area of the releasing municipality's
ETJ into its own ETJ when specified conditions are satisfied:



 (i) the releasing municipality does not provide utility services to the area to be released;


 (ii) the owners of a majority of the land within the area to be released request the
transfer of the ETJ of the adopting municipality;


(iii) the adopting municipality has water pollution standards in place for the area to be
released that are in conformity with those of the Texas Natural Resource
Conservation Commission applicable to the released area on January 1, 1995; and

 

(iv) the adopting municipality has an acceptable service plan in place for water and sewer
service to the area to be released. 



Code § 42.024(b)(1-5).

 In order to be transferred to the ETJ of the adopting municipality, the area eligible for
release must be adjacent to the territory of the adopting municipality. Code § 42.024(b)(3)(A). All of the
eligible area must also be within a county where both municipalities have territory. Code §
42.024(b)(3)(B). Further, one or more school districts in the released area must have a majority of its
territory outside the territory of the releasing municipality. Code § 42.024(b)(3)(C). Finally, the area
transferred into the adopting municipality cannot exceed the difference between (1) the amount of ETJ that
the adopting municipality would have but for the intruding ETJ of the releasing municipality and (2) the
amount of ETJ the adopting municipality actually has. Code § 42.024(b)(6).

 From these conditions it is evident that close geographic proximity between the two eligible
municipalities is necessary to trigger the dictates of section 42.024; a releasing municipality must be very
near an adopting municipality with an eligible area between the two of them. In the entire state, only the
cities of Austin and Cedar Park, and a small area of land between them, meet the criteria of section 42.024. 
No other Texas city can fall within the statute's classification of releasing municipality until at least the year
2001, and it is unlikely that any other area in Texas will ever meet section 42.024's requirements. (3) This
fact is not surprising considering that the legislative history of section 42.024 indicates the statute was
intended to apply only to Austin and Cedar Park. Senate Bill 421 "would allow the governing body of
Cedar Park (as defined in the bill) to adopt a resolution including in its ETJ an area within the ETJ of Austin
(as defined in the bill) . . . ." House Research Organization, Bill Analysis, Tex. S.B. 421, 74th Leg., R.S.
(1995). Moreover, section 42.024's House sponsor, Representative Mike Krusee, told the House Land
and Resource Management Committee that section 42.024 "simply grants the authority to Cedar Park to
adopt some ETJ which is not in the City of Austin which is adjacent to Cedar Park." Section 42.024's
Senate sponsor, Senator Jeff Wentworth, explained that section 42.024 "simply transfers land from the
extraterritorial jurisdiction of the City of Austin . . . to the extraterritorial jurisdiction of the City of Cedar
Park."

 On August 25, 1995, three days before section 42.024 became effective, the City of Cedar
Park ("Cedar Park") brought suit in Williamson County against Austin, seeking a declaratory judgment that
section 42.024 is constitutional, that Cedar Park qualified as an adopting municipality under the statute, and
that Austin qualified as a releasing municipality under the statute. (4) Austin counterclaimed seeking a
declaratory judgment that section 42.024 is unconstitutional. (5)

 The case was tried entirely on stipulated facts. The parties filed the stipulations with the
district court on January 18, 1996. On January 11, 1996, before the stipulations were filed, Austin agreed,
pursuant to section 42.023 of the Code, to voluntarily release approximately 6,845 acres of its ETJ in the
area adjacent to Cedar Park. See Code § 42.023 (West 1988). The release was to take place in three
stages. The first stage, involving a release of 2,976 acres, was effective on January 4, 1996. The transfer
of the second stage contemplated the release of 3,187 acres. The second stage, however, was not to be
released until the trial court rendered a final judgment in the present case. The release of the third and final
stage of 683 acres depended on the decision of the trial court. If the trial court ruled in Austin's favor, the
683 acres would be released upon rendition of a final decision by the court of appeals. If the trial court
ruled in Cedar Park's favor, the remaining acreage would be released upon rendition of the trial court's
judgment along with the land from the second stage.

 On March 4, 1996, the trial court ruled in favor of Cedar Park, adjudging section 42.024
constitutional. Austin then released its ETJ contained in stages two and three in accordance with the
January 11th agreement. Austin appeals the trial court's judgment.


DISCUSSION


Cedar Park's Motion to Dismiss Appeal for Lack of a 


Justiciable Case or Controversy



 Cedar Park has filed in this Court a motion to dismiss this cause, arguing that a viable case
or controversy no longer exists. (6) Specifically, Cedar Park asserts that for a city to be eligible to invoke
section 42.024, its actual ETJ may not equal or exceed the amount of its ETJ as defined by section 42.021
of the Code. See Code § 42.024(b)(6). Cedar Park contends it exceeded that amount when Austin
released its ETJ in compliance with the January 11th agreement. (7) Thus, Cedar Park argues it is not eligible
to utilize section 42.024, and the dispute between it and Austin is moot. We disagree.

 Under section 42.024(b)(6), the area of ETJ released pursuant to section 42.024 may not
exceed "the difference between the total area within the extraterritorial jurisdiction of the adopting
municipality, exclusive of the extraterritorial jurisdiction of the releasing municipality . . . , as determined by
Section 42.021, and the total area within the adopting municipality's extraterritorial jurisdiction . . . ." Id. 
In mathematical terms, the minuend of the formula is the total area of ETJ an adopting municipality could
have under section 42.021 of the Code, but for the interference of the releasing municipality's ETJ (and
arguably but for any intruding territory within the releasing municipality's actual corporate boundaries). The
subtrahend is the adopting municipality's actual total area of ETJ. Thus, if an adopting municipality's actual
ETJ exceeds the ETJ it is allotted under section 42.021 of the Local Government Code, the adopting
municipality is not eligible to transfer ETJ using section 42.024.

 Although the 42.024(b)(6) formula seems convoluted, its application is relatively simple. 
The formula takes the adopting municipality's theoretical ETJ as calculated under section 42.021 and
reduces it by the larger releasing municipality's intrusion into that area. The maximum amount of acreage
the adopting municipality may acquire pursuant to section 42.024 is the difference between the amount of
ETJ to which it is statutorily entitled under section 42.021 and the amount of acreage actually in its ETJ. 
The result is simply to restore to the smaller municipality no more than the amount of ETJ acreage it would
have under section 42.021 of the Local Government Code but for the interference of the ETJ (and perhaps
municipal territory) of its larger neighbor.

 According to the stipulated facts, the largest possible area in Cedar Park's section 42.021
ETJ, excluding Austin's ETJ within that area, is 9,300 acres. (8) Cedar Park contends its actual ETJ, before
the January 11, 1996 agreement between the parties, was 6,000 acres, and Austin's release of ETJ in
accordance with the January 11th agreement added 6,845 acres, raising Cedar Park's actual ETJ to
12,845 acres. Thus, Cedar Park asserts it has 3,545 more acres of ETJ than its hypothetical ETJ
calculated under section 42.021 and, therefore, cannot obtain any additional land under section 42.024. 
However, in calculating the subtrahend of the section 42.024(b)(6) formula--i.e., Cedar Park's actual
ETJ--Cedar Park ignores two important factors: (1) the stipulations were filed with the trial court after
Austin's stage-one release of ETJ, and (2) not all the ETJ released by Austin as a result of the January 11th
agreement became part of Cedar Park's ETJ. Taking these factors into account, it is evident that Cedar
Park has not exceeded the amount of land it is eligible to adopt under section 42.024.

 On January 4, 1996, employing the general ETJ release provision of section 42.023 of the
Local Government Code, Austin released 2,976 acres of its ETJ in stage one of the agreement. On
January 18, 1996, Austin and Cedar Park filed a set of 177 stipulations with the trial court. According to
those stipulations, the total area actually in Cedar Park's ETJ was approximately 6,000 acres. Because
the stipulations were filed after the stage-one release, we must presume that the 6,000 acres to which the
parties stipulated included the 2,976 acres of ETJ released by Austin on January 4, 1996. It was also
stipulated that, according to the section 42.024(b)(6) formula, the difference between Cedar Park's actual
ETJ and the total area of its potential ETJ, as defined by section 42.021, was approximately 3,300 acres.

 On March 4, 1996, when the trial court rendered judgment in favor of Cedar Park, an
additional 3,870 acres of Austin's ETJ was released in stages two and three of the January 11th agreement. 
Cedar Park contends the entire 3,870 acres became part of its ETJ. Based on the evidence before us,
however, only a portion of the ETJ released by Austin on March 4, 1996 actually became part of Cedar
Park's ETJ. Under section 42.021(2) of the Local Government Code, Cedar Park's ETJ extends outward
only one mile from its municipal boundaries. See id. at § 42.021(2). Of the ETJ that Austin released under
the January 11th agreement, only a portion is within one mile of Cedar Park's city limits and is thus
automatically part of Cedar Park's statutorily defined ETJ. According to an affidavit of Luther Polnau, the
Manager of Community Information and Planning in the Planning Department of the City of Austin, only
1,140 of the 3,870 acres released by Austin in stages two and three of the agreement automatically fell
within Cedar Park's ETJ under section 42.021(2). (9) Therefore, assuming that federal obstacles have been
cleared, (10) and that all the other requirements of section 42.024 have been met, approximately 2,160 acres
(3,300 minus 1,140) of Austin's ETJ remain available for Cedar Park to adopt under section 42.024.

 Even assuming that the ETJ released by Austin in stage one on January 4, 1996 was not
included in the stipulations filed with the trial court on January 18, 1996, there is still land subject to transfer
under section 42.024. Of the 2,976 acres released on January 4th, only 1,475 acres are within the one-mile ETJ of Cedar Park as determined under section 42.021(2) of the Code. Thus, if the total area within
Cedar Park's potential ETJ, as determined by section 42.021(2), is 9,300 acres and Cedar Park's actual
ETJ is 6,000 acres, Austin's release of its ETJ under the January 11th agreement added only a total of
2,615 acres to Cedar Park's ETJ, leaving approximately 685 acres of Austin's ETJ still available for Cedar
Park to adopt under section 42.024.

 Cedar Park contends that all of the land released pursuant to the January 11th agreement,
including land more than a mile from Cedar Park's corporate boundaries, is part of its ETJ because ETJ
may include land outside the area dictated by section 42.021 when a municipality has acquired ETJ from
another city that released its ETJ under section 42.023. Section 42.023, however, only authorizes a
municipality to release ETJ. It does not authorize a municipality to automatically "receive" the released area
and thereby increase its ETJ beyond the boundaries of section 42.021. See Code § 42.023 (West 1988).

 Moreover, the amount of ETJ a municipality can have is a function of population, and the
only section we are aware of that allows a municipality's ETJ to extend beyond the boundaries enunciated
in 42.021 is section 42.022(b) of the Code, which states: "The extraterritorial jurisdiction of a municipality
may expand beyond the distance limitations imposed by Section 42.021 to include an area contiguous to
the otherwise existing extraterritorial jurisdiction of the municipality if the owners of the area request the
expansion." Code § 42.022(b) (West 1988) (emphasis added). Thus, a municipality's ETJ may extend
beyond the boundaries set forth in section 42.021 only when the owners of the affected area request the
expansion. See City of Murphy v. City of Parker, 932 S.W.2d 479, 482 (Tex. 1996). There is no
evidence in this record that the owners of the land released by Austin pursuant to the January 11, 1996
agreement requested or even consented to the expansion. Therefore, we cannot consider the portion of
Austin's released ETJ that is outside Cedar Park's one-mile ETJ boundary to be part of Cedar Park's ETJ. 
Accordingly, Cedar Park's current ETJ has not exceeded its theoretical "section 42.021 ETJ" so as to
preclude it from using section 42.024 to force a transfer of Austin's ETJ.

 While additional land appears to be subject to section 42.024, another jurisdictional
question arises: since Cedar Park has never actually used section 42.024, is this case ripe for a declaration
of the statute's constitutionality? We conclude it is. The Texas Uniform Declaratory Judgments Act
provides:


 A person interested under a . . . written contract or other writings constituting a contract
or whose rights, status, or other legal relations are affected by a . . . contract . . . may have
determined any question of construction or validity arising under the instrument . . . [or]
contract . . . and obtain a declaration of rights, status or other legal relations thereunder.



Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) (West 1988). The purpose of a declaratory action is to
establish existing rights, status, or other legal relation. Bonham State Bank v. Beadle, 907 S.W.2d 465,
467 (Tex.1995); Republic Ins. Co. v. Davis, 856 S.W.2d 158, 164 (Tex.1993). An actual controversy
or the "ripening seeds" of one must exist, however, before a declaratory judgment is proper; ripening seeds
means a set of facts that show that, rather than a hypothetical or abstract conflict, litigation is imminent and
inevitable. Peacock v. Schroeder, 846 S.W.2d 905, 912 (Tex. App.--San Antonio 1993, no writ);
Wolfe v. Schuster, 591 S.W.2d 926, 929 (Tex. Civ. App.--Dallas 1979, no writ); Gray v. Bush, 430
S.W.2d 258, 263 (Tex. Civ. App.--Fort Worth 1968, writ ref'd n.r.e.); Ainsworth v. Oil City Brass
Works, 271 S.W.2d 754, 760-761 (Tex. Civ. App.--Beaumont 1954, no writ).

 In the present case, although Cedar Park has not made actual use of section 42.024, we
believe the ripening seeds of a genuine controversy are present. It was, after all, Cedar Park that filed this
suit in the first place, seeking a declaration that section 42.024 is constitutional, that Austin is a releasing
municipality, and that Cedar Park is an adopting municipality as those terms are defined in section 42.024. 
Moreover, at the time Austin released a portion of its ETJ pursuant to the January 11, 1996, agreement,
Cedar Park was in the process of adopting a service plan for the affected area, a necessary prerequisite
to the implementation of section 42.024. See Code § 42.024(b)(4). Finally, Cedar Park's own attorney
noted in oral argument that, if there was any land left to be transferred under section 42.024, Cedar Park
would be "very interested" in knowing about it. Certainly Cedar Park believed that a "real controversy"
existed when it filed this suit. Because we have concluded that the January 11, 1996 agreement has not
rendered that controversy moot, it still exists. Cedar Park's interest in utilizing the provisions of section
42.024 is not so speculative and hypothetical as to render this Court's opinion merely advisory. We
conclude, therefore, that the controversy is ripe for adjudication. We overrule Cedar Park's "Motion to
Dismiss Appeal for Lack of a Justiciable Case or Controversy."


Section 42.024's Violation of Article III, Section 56


 In a single point of error, Austin contends section 42.024 is an unconstitutional local law
that targets a single geographic area and is of no statewide significance. Article III, section 56 of the Texas
Constitution provides in relevant part:


 LOCAL AND SPECIAL LAWS. The Legislature shall not, except as otherwise
provided in this Constitution, pass any local or special law . . . [r]egulating the affairs of
counties, cities, towns, wards or school districts. . . .


 And in all other cases where a general law can be made applicable, no local or
special law shall be enacted.



Tex. Const. art. III, § 56. The purpose of article III, section 56 is to "prevent the granting of special
privileges and to secure uniformity of law throughout the State as far as possible." Miller v. El Paso
County, 150 S.W.2d 1000, 1001 (Tex. 1941). A leading commentator on the Texas Constitution, using
language more blunt than the supreme court's, describes the provision's purpose as being "to stop the
legislature from meddling in local matters." 1 George D. Braden, The Constitution of the State of Texas: 
An Annotated and Comparative Analysis 276 (1977). In particular, article III, section 56 prevents
lawmakers from engaging in the "reprehensible practice of trading and 'logrolling,'" i.e., trading votes to
advance personal rather than public interests. Miller, 150 S.W.2d at 1001.

 A law is not a prohibited local law merely because it applies only in a limited geographic
area. The legislature has broad authority to make classifications for legislative purposes. See id. When
a law is limited to a particular class or affects only the inhabitants of a particular locality, however, "the
classification must be broad enough to include a substantial class and must be based on characteristics
legitimately distinguishing such class from others with respect to the public purpose sought to be
accomplished by the proposed legislation." Id. at 1001-02. "The primary and ultimate test of whether a
law is general or special is whether there is a reasonable basis for the classification made by the law, and
whether the law operates equally on all within the class." Maple Run at Austin Mun. Util. Dist. v.
Monaghan, 931 S.W.2d 941, 945 (Tex. 1996) (quoting Rodriquez v. Gonzales, 227 S.W.2d 791, 793
(Tex. 1950)). Under this test, we conclude that section 42.024 is an unconstitutional local law.

 As discussed above, in order for section 42.024 to be applicable, a multitude of precise
conditions must be met. Cedar Park contends that each of the restrictions contained in section 42.024 is
reasonably related to the classifications created therein; it argues that the classifications further the statute's
purpose of allowing a small city, the otherwise lawful ETJ of which is blocked by the abusive ETJ practices
of a nearby large city, the opportunity to expand to adjacent areas with which the small city has a more
natural community of interest, so long as the small city is willing and able to provide utility services that the
large city does not provide to the area. We can find no fault with the statute's general purpose. However,
we believe the classifications made by section 42.024 relating to limited-purpose annexation, owning an
electric utility, and appropriating water via a transbasin diversion permit have no reasonable basis and do
not legitimately distinguish Austin and Cedar Park from other municipalities with regard to the public
purpose the statute seeks to accomplish. Although Austin asserts that section 42.024 contains other
unreasonable classifications, we will address only these three.


(i) Limited-Purpose Annexation

 For a city to qualify as a releasing municipality under section 42.024, it must have "a charter
provision allowing for limited-purpose annexation, and have annexed territory for a limited purpose." Code
§ 42.024(a)(2). As far as we are able to determine, limited-purpose annexation has nothing to do with
abusive ETJ practices by large cities, because this form of "annexation" does not and cannot extend a
municipality's ETJ.

 Limited-purpose annexation allows a home-rule city with a population of more than
225,000 persons to "annex" an area for the limited purposes of applying its planning, zoning, health, and
safety ordinances. Code § 43.121 (West 1988). Limited-purpose annexation is often used as a first step
in preparing an area for full annexation and ensures that the area will develop in a manner that is compatible
with a city's standards for development. In 1985, the legislature amended the Local Government Code
to expressly provide that limited-purpose annexation does not extend a municipality's ETJ. See Code
§ 43.131 (West Supp. 1997). (11) Although a municipality could, before 1985, use limited-purpose
annexation if its city charter permitted, it appears doubtful that such limited-purpose annexation ever had
the effect of extending ETJ. We are unaware of any court holding that limited-purpose annexation before
1985 extended ETJ at all. (12)

 Cedar Park contends limited-purpose annexation may be used as a legislative proxy for
limiting ETJ acquisition of cities that have experienced "rapid and uneven municipal growth." Limited-purpose annexation, however, does not equate with either rapid or uneven municipal growth. As discussed
above, limited-purpose annexation has generally been used as a tool to control a city's growth and ensure
that, prior to full annexation, the area to be annexed develops in a manner that is compatible with the city's
standards for development. There is simply no logical nexus between limited-purpose annexation and rapid
or uneven municipal growth.

 Moreover, the mere fact that a city's charter allows for limited-purpose annexation, and
that the city has exercised that power, has nothing to do with abusive ETJ practices. Section 42.024's
broadly written classification does not require that a city's prior exercise of its limited-purpose annexation
power have any relation to the area eligible for release under section 42.024. Thus, even if limited-purpose
annexation could extend ETJ, the releasing municipality might have annexed land for a limited purpose on
the opposite side of its boundary from the area eligible for release under section 42.024, yet still be subject
to section 42.024 as a result of such annexation. The statute does not provide any reasonable relation
between the prior limited-purpose annexation and the area eligible for release under section 42.024. 
General terms regarding limited-purpose annexation that have no rational link to an eligible area and abusive
ETJ practices are unreasonable and violate article III, section 56 of the Texas Constitution.

 Arguably, a more reasonable classification might have been to limit section 42.024's
application to municipalities that had extended their ETJ through strip annexation. Now outlawed, strip
annexation allowed a municipality to annex extremely narrow "strips" of land extending outward from its
boundary, often along highways or waterways. See, e.g., City of Pasadena v. State ex rel. City of
Houston, 442 S.W.2d 325, 328-30 (Tex. 1969); May v. City of McGivney, 479 S.W.2d 114, 117 (Tex.
Civ. App.--Dallas 1972, writ ref'd n.r.e.); see also Robert R. Ashcroft & Barbara K. Bulghur, Home
Rule Cities and Municipal Annexation in Texas: Recent Trends and Future Prospects, 15 St. Mary's
L. J. 519, 531 (1984). Strip annexation added only minimal municipal territory, thereby minimizing the
city's obligation to provide the municipal services it is required to supply within its corporate boundaries. 
Unlike limited-purpose annexation, however, strip annexation allowed the municipality's ETJ to be
extended from the narrow strip that had been annexed. Austin, like many other Texas cities, used strip
annexation to extend its ETJ. (13) Realizing the abuses taking place with strip annexation, the legislature in
1989 effectively prohibited it. See Code §§ 43.054, 43.122 (West Supp. 1997). In spite of the
legislature's apparent intent to limit cities that abused strip annexation to extend their ETJ's, a municipality's
prior abuse of strip annexation is not one of section 42.024's criteria for a city to be a releasing
municipality.


(ii) Ownership of an Electric Utility

 In order to qualify as a releasing municipality under section 42.024, a city must also own
an electric utility. See Code § 42.024(a)(2). Like limited-purpose annexation, owning an electric utility
has no reasonable relation to abusive ETJ tactics by large cities. Cedar Park contends, however, that the
requirement that the releasing municipality own an electric utility is rationally related to the purpose of
section 42.024 because the failure to provide utility services to an area in need of services is particularly
egregious when the releasing municipality is capable of offering services, but refuses to provide them. We
disagree. A municipality is not obligated to provide electrical services to its ETJ. The mere ownership of
an electric utility, therefore, does not evince any culpable activity by the releasing municipality that would
justify the "punishment" of losing a portion of its current ETJ to an adjacent adopting municipality. 
Accordingly, we can discern no rational basis for the conclusion that when a municipality's population is
greater than 450,000 and it owns an electric utility, yet does not provide electrical service to a portion of
its ETJ, it may be forced to release that portion of its ETJ.

 Moreover, ownership of an electric utility by the releasing municipality does not relate to
an adopting municipality's ability to provide electrical services for the area affected by section 42.024. For
example, no part of the area between Austin and Cedar Park affected by section 42.024 is deprived of
electrical service. Austin provides service to a portion of the affected area, and Pedernales Electric
Cooperative and Texas Utilities provide service to other parts. Electric service areas are regulated by the
Texas Public Utility Commission, and if Austin attempted to extend its utility service to parts of the affected
area already serviced by other electric providers, it could be threatened with extensive litigation before the
Public Utility Commission. The inclusion of this requirement, therefore, is not reasonably related to the
purpose of section 42.024 and has no reasonable basis other than to single out a particular area of central
Texas--land between Cedar Park and Austin--in violation of article III, section 56 of the Texas
Constitution.


(iii) Transbasin Diversion Permit

 Among the factors necessary to qualify as an adopting municipality under section 42.024
is that a city must appropriate water through a transbasin diversion permit from a river authority in which
it has territory. See Code § 42.024(a)(1) (West Supp. 1997). A transbasin diversion permit is obtained
in order to transfer water from one watershed to another. Tex. Water Code Ann. § 11.085 (West 1988). 
See, e.g., Corwin W. Johnson & Larry D. Knippa, Transbasin Diversion of Water, 43 Tex. L. Rev.
1035, 1046 (1965). A diversion permit allows a municipality to receive or appropriate surface water from
a source outside its own watershed. See, e.g., Halsell v. Texas Water Comm'n, 380 S.W.2d 1, 3 (Tex.
Civ. App.--Austin 1964, writ ref'd n.r.e.). Cedar Park defends the reasonableness of this classification
by arguing that having a transbasin diversion permit makes it more likely that an adopting municipality will
have access to a water supply sufficient to meet the needs of the eligible area. Having a transbasin
diversion permit, however, does not guarantee an adequate supply of water. For example, Cedar Park,
which has a transbasin diversion permit from the Texas Natural Resource Conservation Commission to
obtain water from the Lower Colorado River Authority, has repeatedly received millions of gallons of water
from Austin to alleviate water shortages. (14)

 In addition, one consideration in determining whether a transbasin diversion permit should
be granted in the first place is the extent to which the applicant will be benefitted by the diversion. See City
of San Antonio v. Texas Water Comm'n, 407 S.W.2d 752, 758-59 (Tex. 1966). Thus, a city that had
no need of a transbasin diversion permit (i.e., had no water shortage problem) might well be unable to get
one. As a result, the requirement of a transbasin diversion permit would accomplish the illogical result of
preventing smaller cities from qualifying as adopting municipalities under section 42.024 if they had such
an abundance of available water from their own watersheds that they had no need of a transbasin diversion
permit. In light of the statute's purported purpose of providing quality utility services to an area currently
without utility services, there is no reasonable basis for including a restriction that by definition implies the
adopting municipality's inability to adequately supply water from its own watershed.

 While the wisdom or expediency of a law is the legislature's prerogative, singling out a
particular local area for special treatment without a reasonable basis for doing so violates the Texas
Constitution. While the unreasonableness of any one of the classifications discussed above would be
sufficient to render section 42.024 unconstitutional, viewed in toto the classifications clearly indicate that
section 42.024 is, within the meaning of article III, section 56, a prohibited local law.


Section 42.024 Does Not Have a Statewide Purpose


 Cedar Park argues in the alternative that, even if section 42.024's requirements are
unreasonable, making it a local law within the meaning of article III, section 56, the law is still constitutional
because it affects a matter of statewide interest. See Lower Colorado River Auth. v. McCraw, 83
S.W.2d 629, 636 (Tex. 1935) (law is not unconstitutional, even though restricted to local area, if it affects
a matter of statewide interest). Specifically, Cedar Park argues that section 42.024 is designed to curb
abusive ETJ practices, a matter of statewide interest. This argument mirrors the "statewide interest"
argument recently rejected by the supreme court in Maple Run at Austin Municipal Utility District v.
Monaghan, 931 S.W.2d 941, 947 (Tex. 1996). The statute at issue in Maple Run involved another
matter of apparent statewide interest: conservation. Nonetheless, the supreme court held that "one may
[not] simplistically conclude that any law having a . . . [general] purpose is ipso facto not a local or special
law." Id. The obvious basis for this holding is that adopting such an exception to article III, section 56
would swallow the constitutional rule against such legislation, since any statute can be vaguely described
in general terms. Similarly, generally describing section 42.024 as curbing "abusive ETJ practices" does
not save an otherwise unconstitutional local law. To bring what would appear to be a local law within
"statewide interest" protection, the statute must "affect[] a substantial class of persons over a broad region
of the state." Id. Section 42.024, which applies to a small area of land in central Texas, does not meet that
test. Moreover, as the supreme court has stated, "the ultimate question under Article III, Section 56 is
whether there is a reasonable basis for the legislature's classification[s]." Id. In the present case, we
conclude there is no reasonable basis for the classifications discussed above. Accordingly, we sustain
Austin's point of error.


CONCLUSION


 Having sustained Austin's point of error, we reverse the judgment of the trial court and
render judgment declaring section 42.024 of the Texas Local Government Code unconstitutional as
violating article III, section 56 of the Texas Constitution.



 J. Woodfin Jones, Justice

Before Justices Powers, Aboussie and Jones

Reversed and Rendered

Filed: August 14, 1997

Publish

1. See Act of May 29, 1995, 74th Leg., R.S., ch. 766, § 1, 1995 Tex. Gen. Laws 4010. Senate
Bill 421 appears as the first of two 1995 regular session enactments codified as section 42.024 of the Local
Government Code.
2. An exception to this rule, which is inapplicable to this case, occurs in the cases of judicial
apportionment of ETJs under Tex. Loc. Gov't Code Ann. § 42.901 (West 1988).
3. The parties stipulated that in order for another Texas city to meet the definition of a releasing
municipality, many contingencies must occur. For example, Houston, Dallas, or El Paso would have to buy
an electric utility, amend its city charter to include limited purpose annexation powers, and exercise those
powers. San Antonio already owns an electric utility, but it would have to amend its city charter to permit
limited-purpose annexation and exercise that power. Other than the above cities, no municipality could join
Austin as a releasing municipality until at least 2001, after the results of the next federal decennial census
are released. See Tex. Gov't Code Ann. § 311.005(3) (West 1988).


 The parties' stipulations list fourteen other Texas towns that could possibly meet the definition
of an adopting municipality. Four of the towns, Joshua, Rose City, O'Donnell, and Tahoka, are not home-rule cities. Five of the towns, Brownfield, Lamesa, Levelland, Plainview, and Slanton, do not have
transbasin diversion permits like Cedar Park, and the entity from which they do purchase water, the
Canadian River Municipal Water Authority, is not a "river authority" as defined in section 30.003(4) of the
Texas Water Code. See Tex. Water Code Ann. § 30.003(4) (West 1988). Finally, any theoretically
possible releasing municipality must develop in close proximity to an adopting municipality, and there must
be "eligible area" between them that would be subject to the adopting municipality's water quality standards
that conform with those of the Texas Natural Resource Conservation Commission as of January 1, 1995. 
See Code § 42.024(b)(4). In sum, Austin and Cedar Park are, as a practical matter, the only cities that
could qualify to use section 42.024.
4. Wilson Land and Cattle Co., Carolville, Ltd., and Aldine, Ltd., land development interests,
intervened and aligned themselves with Cedar Park. Carolville, Ltd. and Aldine, Ltd. declined to
participate in this appeal.
5. Although receiving notice of the constitutional challenge, the Attorney General declined to
intervene in the proceedings. See Tex. Civ. Prac. & Rem. Code Ann. § 37.006(b) (West 1986).
6. See Texas Workers' Compensation Comm'n v. Garcia, 893 S.W.2d 504, 517-18 (Tex.
1995) (appellate court may not review the constitutionality of a statute unless there is a real controversy
between the parties that will be determined by the judicial declaration sought).
7. The Local Government Code contains a procedure by which a municipality's ETJ can expand
beyond the limitations imposed by section 42.021. See Code § 42.022(b).
8. The parties could not agree on whether section 42.024's ceiling on the size of the released area
requires that the adopting municipality's hypothetical ETJ be calculated by subtracting from its maximum
section 42.021 ETJ only the intruding area of the releasing municipality's ETJ, or by subtracting both the
intruding area of the releasing municipality's ETJ and any intruding area actually within its corporate
boundaries. Accordingly, the parties stipulated to the number of acres under both methods of calculation,
yielding results of 12,400 acres and 9,300 acres, respectively. The discrepancy does not affect our
decision. For purposes of this issue, we will assume the proper calculation under section 42.024 is 9,300
acres, because that figure seems most favorable to Cedar Park on the mootness issue.
9. Each court of appeals may, on affidavit or otherwise, as the court may determine, ascertain
certain matters of fact that are necessary to the proper exercise of its jurisdiction. Tex. Gov't Code Ann.
§ 22.220 (West 1988); Willard v. Davis, 881 S.W.2d 907, 910 (Tex. App.--Fort Worth 1994, orig.
proceeding).
10. As a matter of law, none of Austin's ETJ released through the January 11, 1996 agreement can
be treated as being outside Austin's ETJ and inside Cedar Park's ETJ until the preclearance requirements
of section 5 of the Federal Voting Rights act are met. See 42 U.S.C.A. § 1973c (West 1994).
11. The law that became section 43.131 originated in 1985, when the legislature enacted SB 967,
which amended the Municipal Annexation Act of 1963 to provide specifically that "the area of a city's
extraterritorial jurisdiction may not be extended by any annexation except for full purposes." Act of May
27, 1985, 69th Leg., R.S., ch. 649, § 2, 1985 Tex. Gen. Laws 2398, 2399. The provision expired on
June 1, 1987, but the legislature extended the prohibition permanently through section 5 of SB 962. See
Act of June 1, 1987, 70th Leg., R. S., ch. 1077, § 5, 1987 Tex. Gen. Laws 3674, 3679 (Tex. Rev. Civ.
Stat. Ann. art. 970c, § 8, since repealed and codified at Tex. Loc. Gov't Code Ann. § 43.131 (West
Supp. 1997)).
12. Indeed, the parties stipulated that in 1985, before the effective date of Act of May 27, 1985,
69th Leg., R.S., ch. 649, § 2, 1985 Tex. Gen. Laws 2398, 2399 (predecessor to section 43.131 of the
current Local Government Code), State District Judge Joseph Hart of Travis County ruled that limited-purpose annexation did not extend or change the limits of an annexing municipality for any purpose other
than for zoning and planning and for sanitation and health protection. Judge Hart's decision was not
appealed.
13. Indeed, Austin's use of strip annexation to extend its ETJ appears to have been the legislature's
primary focus in enacting section 42.024. The parties stipulated that, in referring to what became section
42.024, Senator Jeff Wentworth stated to the Senate Intergovernmental Relations Committee on March
8, 1995: "I'd like to point out that the only reason this area [affected by section 42.024] is currently in the
ETJ of the City of Austin is because of strip-annexation that occurred years ago that is now illegal." State
Representative Mike Krusee, in discussing what ultimately became section 42.024, stated to the House
Land & Resource Management Committee on March 7, 1995, that "at the time when Austin really annexed
this land, got this land in their ETJ by virtue--I shouldn't really say virtue, by vice maybe--of having strip
annexed this land in order to get the valuable commercial property." Additionally, Mr. Terry Bray, who
represented some intervenors in the district court, testified before the Senate Intergovernmental Relations
Committee that, "[The land affected by section 42.024] would be part of the Cedar Park ETJ already but
for the fact that Austin through some strip annexation that occurred a number of years ago extended its ETJ
far north."
14. The reason for this is that Cedar Park's permit allows diversion of water only to the portion of
the city that lies within Travis County, while the vast majority of Cedar Park is in Williamson County.


Tex. Civ. Prac. & Rem. Code Ann. § 37.006(b) (West 1986).
6. See Texas Workers' Compensation Comm'n v. Garcia, 893 S.W.2d 504, 517-18 (Tex.
1995) (appellate court may not review the constitutionality of a statute unless there is a real controversy
between the parties that will be determined by the judicial declaration sought).
7. The Local Government Code contains a procedure by which a municipality's ETJ can expand
beyond the limitations imposed by section 42.021. See Code § 42.022(b).
8. The parties could not agree on whether section 42.024's ceiling on the size of the released area
requires that the adopting municipality's hypothetical ETJ be calculated by subtracting from its maximum
section 42.021 ETJ only the intruding area of the releasing municipality's ETJ, or by subtracting both the
intruding area of the releasing municipality's ETJ and any intruding area actually within its corporate
boundaries. Accordingly, the parties stipulated to the number of acres under both methods of calculation,
yielding results of 12,400 acres and 9,300 acres, respectively. The discrepancy does not affect our
decision. For purposes of this issue, we will assume the proper calculation under section 42.024 is 9,300
acres, because that figure seems most favorable to Cedar Park on the mootness issue.
9. Each court